COMMONWEALTH *vs.* LAWRENCE J. McCAULEY.

Middlesex.    December 3, 1968. — April 7, 1969.

Present: WILKINS, C.J., CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Homicide. Evidence,* Of consciousness of guilt. *Practice, Criminal,* Capital case.

At a trial for murder by shooting in the room of an eyewitness, where it appeared that he and the defendant left the room after the shooting and went to the dwelling of a friend of the defendant from whom they wanted a ride to another city, and that the eyewitness told what had occurred at his room to the defendant's friend, who then went upstairs to talk to his wife, a statement in his absence to the eyewitness by the defendant, "Give me the bullets to the gun, I'm going upstairs and

I'm going to wipe out" his friend "and his wife and the kid," was
properly admitted in evidence solely to show consciousness of guilt by
the defendant. [558]
Evidence at a murder trial that after the defendant in the room of a friend
had been "fooling around" for a while with an automatic pistol from
which his friend had just removed the magazine clip because of the
defendant's attempt to fire at him, the clip was inserted in the pistol,
the defendant pointed it toward the floor, pulled back and released the
slide, raised the gun, pointing it at the victim, a new acquaintance
sitting facing him, pulled the trigger, and laughed when the pistol fired
and the victim fell forward, together with evidence of what the de-
fendant then said, warranted a verdict of murder in the second degree
[559]; the judge correctly ruled that the evidence showed none of the
circumstances which would mitigate the crime to · voluntary man-
slaughter [559]; but the judge was in error in withdrawing the issue
of involuntary manslaughter from the jury [561–562].
On review of a capital case pursuant to G. L. c. 278, § 33E, this court, on
the record, having determined that a verdict of murder in the second
degree was warranted but that it was error for the trial judge to with-
draw the issue of involuntary manslaughter from the jury, reversed
the judgment, set aside the verdict, and remanded the case to the
Superior Court for a new trial on so much of the indictment as charged
murder in the second degree. [562]

INDICTMENT found and returned in the Superior Court on
December 11, 1967.

The case was tried before *McLaughlin,* J.

*Robert A. Stanziani* for the defendant.

*Robert M. Mardirosian,* Assistant District Attorney
(*Ruth I. Abrams,* Assistant District Attorney, with him),
for the Commonwealth.

KIRK, J. Upon an indictment charging murder the de-
fendant McCauley was found guilty of murder in the second
degree at a trial subject to G. L. c. 278, §§ 33A–33G. The
case is here on his appeal with assignments of error.

We state the evidence, consisting mainly of eyewitness
testimony, which bears upon the issues sought to be raised
by the appeal. Shortly after 10:30 P.M. on November 24,
1967, three young men, Alexander Gedutis (the deceased),
Brian Johnson and William J. Sullivan were walking on the
ramp which leads to the Massachusetts Bay Transportation
Authority (MBTA) station at Charles Street, Boston.[1]

---

[1] The narrative of the events is taken primarily from the testimony of
Sullivan. His testimony in the main was corroborated by Johnson.

Earlier in the day Johnson had driven to Boston from Concord, New Hampshire. He met Gedutis in Boston in the afternoon. The two met Sullivan on Charles Street about 10:30 P.M. Gedutis knew Sullivan; Johnson did not. Gedutis was eighteen years old; Johnson and Sullivan were seventeen and nineteen years old, respectively, at the time of the trial. The three young men intended to take an MBTA train to Cambridge. Someone from the street called out "Sully!" It was McCauley, who ran up the ramp and joined the group. McCauley knew Sullivan but not the others.[2] There were some signs that McCauley had been drinking. After introductions the four proceeded by subway to Central Square, Cambridge. On the way Sullivan, McCauley and Gedutis finished the remaining half of a one-half pint of anisette which Sullivan had purchased and partly consumed with two other friends earlier in the evening. From Central Square the group walked to Sullivan's living quarters at nearby Columbia Street, Cambridge.

Upon arrival at Sullivan's room, the group looked at pictures of nudes on the walls and ceiling. A marihuana cigarette was rolled and smoked by all. Sullivan saw McCauley remove an automatic pistol from the bureau drawer where Sullivan kept it. He told McCauley that the gun was loaded. Sullivan and McCauley were seated beside one another on the bed. The other two were seated on chairs facing them. McCauley was just looking at the gun. Then he pressed the hammer back, pointed the weapon at Sullivan's head and squeezed the trigger. The gun did not fire. It did not fire because, although the magazine clip was fully loaded with live ammunition, there was no bullet in the chamber. Sullivan took the gun away from McCauley. He removed the clip from the handle and placed it on his bed near or under the pillow. McCauley said something like, "Don't you trust me?" to Sullivan, who thereupon gave him the pistol, then empty. For a while, McCauley was "fooling around" with the empty gun.

---

[2] McCauley did not testify.

Thereafter, Sullivan heard the click of the clip being inserted into the gun. He saw McCauley then point the gun toward the floor and pull the slide back and release it. McCauley raised the gun, pointing it at Gedutis. Sullivan saw pressure being exerted by McCauley's finger on the trigger. He could tell by the red and white blotches. The gun fired and Gedutis fell foward clutching his chest. McCauley laughed. Sullivan took the gun from him and unloaded it. McCauley lifted Gedutis' head, put his ·hand over his mouth and said, "Let's put a bullet in his head, let's not leave any witnesses."

Sullivan took a suitcase and left with McCauley and Johnson. Gedutis was abandoned as dead. The three young men went by cab first to the Greyhound Bus Terminal in Boston and then to the dwelling of a friend of McCauley, Ralph Iamondi. They all wanted Iamondi to give them a ride to New York. Sullivan told Iamondi what had occurred at his apartment. Iamondi then left to go upstairs to talk to his wife. In his absence McCauley said to Sullivan, "Give me the bullets to the gun, I'm going upstairs and I'm going to wipe out Ralph and his wife and the kid." Later Iamondi and the three young men drove around in Iamondi's car. Sullivan repeated to Iamondi the story of what had happened in the apartment. At this point McCauley laughed and said, "Don't believe him." The four then drove to Castle Island where Sullivan, over McCauley's protest, threw the weapon and the clip into the harbor. They were later recovered by the police.

There was no evidence of any unpleasantness or anger or fights prior to the shooting.

At the close of the Commonwealth's case the defendant moved for a directed verdict of not guilty, which was denied. At a conference then held with counsel the judge stated that he thought the evidence did not warrant submitting the issue of manslaughter, whether voluntary or involuntary, to the jury. The defendant's counsel replied that he understood. Later in the conference the judge said, in part, to counsel: "[I]f there is any evidence of any kind that you

think warrants submission on the issue of manslaughter to the jury, will you give it to me or point it out to me before 2 o'clock. . . . [T]here is a complete vacuum of the elements of voluntary manslaughter . . . [and] the evidence of involuntary manslaughter was suggested only in the form of the questions which were never adopted by a witness. . . . [T]hat's the way I read his evidence." The prosecution stated that there was nothing to warrant submitting the issue of manslaughter to the jury. Shortly after two o'clock, the defence rested, making no suggestion to the judge on the theory of manslaughter on the evidence.

We first dispose of a question of evidence. The defendant contends that there was error in admitting testimony of McCauley's demand for the bullets from Sullivan so that he could "wipe out" the Iamondi family. The demand was made after McCauley learned that Iamondi had been informed of the shooting and had left the group to talk to his wife. The statement was offered and admitted solely to show consciousness of guilt by McCauley. In the context of the events of the evening the statement had probative value for that limited purpose. See *Commonwealth* v. *Curry,* 341 Mass. 50, 55. There was no error.

The chief question sought to be raised by the defendant is whether the judge erred in instructing the jury that there was no evidence in the case to warrant a verdict of manslaughter. The main arguments of the Commonwealth have also been directed to this issue. It is by no means clear from the record that an exception to the charge was properly saved on the point. "It is settled that an assignment of error under G. L. c. 278, §§ 33A–33G, brings nothing to this court unless based on a valid exception. *Commonwealth* v. *Gray,* 314 Mass. 96, 102, and cases cited." *Commonwealth* v. *Chapman,* 345 Mass. 251, 255–256.

Since, however, the case is a "capital case" as the term is defined in G. L. c. 278, § 33E, as amended by St. 1962, c. 453, the whole case is transferred to us for our consideration on the law and the evidence and with power, upon such consideration, "for any . . . reason that justice may

require [to] (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence." See *Commonwealth* v. *Baker*, 346 Mass. 107, 108–109. We reach the merits.

The evidence against McCauley, if believed, warranted the verdict of guilty of murder. Murder is the unlawful killing of a human being with malice aforethought. "Where the killing is caused by the intentional use of a deadly weapon malice may be inferred unless by the circumstances it is disproved." *Commonwealth* v. *Young*, 326 Mass. 597, 600, and authorities cited. The burden of proof is on the Commonwealth to prove every element of the offence charged. If on any view of the evidence in a prosecution for murder the issue of manslaughter is open, it must be submitted to the jury. *Commonwealth* v. *Kendrick*, 351 Mass. 203, 212. *Commonwealth* v. *Campbell*, 352 Mass. 387, 392. The judge correctly ruled that the evidence showed none of the circumstances which would mitigate what otherwise would be murder to voluntary manslaughter. *Commonwealth* v. *Webster*, 5 Cush. 295, 307–308. *Commonwealth* v. *Kendrick*, 351 Mass. 203, 212.

The judge's instructions to the jury on the issue of involuntary manslaughter, however, which were foreshadowed by his statements to counsel in conference at the close of the trial, require examination and consideration. The instructions were: "[T]here is no possible way that you can justify a verdict of manslaughter in this case on the evidence" and "the first area to be submitted to deliberation would be whether or not a murder had in fact been committed, before you attempt to decide the degree. . . . And obviously, if you . . . are not satisfied beyond a reasonable doubt that any murder was committed, the defendant is entitled to a not guilty." [3] His statement to counsel was "the evidence of involuntary manslaughter was suggested

---

[3] In a supplement to the main charge the jury were instructed on the elements of the crime of assault and battery.

only in the form of the questions which were never adopted by a witness."

No special force or credibility attached to the testimony of the prosecution's witnesses because they were the only eyewitnesses who testified. The purpose of the trial was to allow the jury in their deliberations to decide whether to accept or reject in whole or in part the testimony of any and all witnesses in order that they might under correct instructions arrive at a proper verdict. It is the province of the jury and the jury alone to pass upon the credibility of witnesses. That the prosecution's witnesses refused to adopt the suggestions of defence counsel was merely incidental to the quest for the truth and had no conclusive effect in law.

Withdrawal of the issue of involuntary manslaughter from the consideration of the jury denied them the opportunity to pass upon the credibility of the Commonwealth's witnesses in critical aspects of their testimony which might have affected the jury's deliberations and their verdict. Disbelief or doubt in parts of the testimony of Sullivan or Johnson might have led the jury, if given the opportunity, to return a verdict of guilty of involuntary manslaughter rather than murder. "Involuntary manslaughter is an unlawful homicide, unintentionally caused . . . by an act which constitutes such a disregard of probable harmful consequences to another as to constitute wanton or reckless conduct. *Commonwealth* v. *Welansky,* 316 Mass. 383, 399. *Commonwealth* v. *Bouvier,* 316 Mass. 489, 494–496. *Commonwealth* v. *Atencio,* 345 Mass. 627, 629. *Commonwealth* v. *Wallace,* 346 Mass. 9, 12." *Commonwealth* v. *Campbell,* 352 Mass. 387, 397.

For their bearing upon the likelihood of the homicide being unintentional rather than intentional the jury could consider the degree and nature of the acquaintance among the young men, the fact of a fortuitous meeting a few hours before the shooting, the relationship of amiability to the time of the shooting, and the total absence of any reason for hostility between McCauley and Gedutis who had never

met before. On the question of interest or motive in testi-
fying, the jury could consider the demonstrable fact that the
homicide took place in Sullivan's room, that Sullivan ad-
mittedly owned the pistol, and that after the killing Sullivan
admittedly threw the pistol into the harbor. On the sub-
stance of the prosecution's testimony, if the jury believed
that McCauley had placed the gun at Sullivan's head,
pulled back the hammer and squeezed the trigger they
should have been left free to decide if his act was in the
belief that the gun was not loaded, or in ignorance whether
the gun was loaded, or in reckless indifference whether it
was loaded or not. This conduct tended to show gross un-
familiarity with the weapon or utter recklessness in its use.
It did not require a finding of an intent to kill. Similarly,
disbelief or a reasonable doubt in the minds of the jury that
McCauley knew that the drawing back and the forward
movement of the slide would result in the insertion of a
bullet in the chamber and the cocking of the hammer so
that all that would be necessary to discharge the weapon
was the squeezing of the trigger would not justify a verdict
of murder, though it would warrant a verdict of involuntary
manslaughter if they believed he had reason to know that
there were bullets in the magazine clip. See *Commonwealth* v.
*Wallace*, 346 Mass. 9, 12–13. Finally, the jury were not
required to believe the testimony tending to show that
McCauley intentionally discharged the weapon as he "raised
the gun, pointing it at Gedutis." If they disbelieved or
reasonably doubted that he then intentionally discharged
the gun, he was not guilty of murder but could be found
guilty of manslaughter.

Having in mind the burden of proof and the constituent
elements of an indictment for murder and the latitude which
must be given to the jury in assessing the credibility of wit-
nesses, we think it was error to restrict the jury to the al-
ternatives of (a) guilty of murder in the first or second de-
gree or (b) not guilty. We feel obliged to state, as we have
before stated, that we do not question the propriety of the
verdict returned by the jury. We are, however, concerned

with the impropriety of withholding from the consideration of the jury another verdict which, although they might not have reached it, was nevertheless open to them upon the evidence. *Commonwealth* v. *Kendrick*, 351 Mass. 203, 213. Another verdict may be open to the jury on the ground that they disbelieve the evidence presented by the prosecution as well as on the ground that there is evidence in conflict with that relied upon by the prosecution.

In light of the full circumstances disclosed by the record and in contemplation of the duty to consider the whole case broadly and of the power to "order a new trial," we are of opinion that the judgment must be reversed, the verdict set aside, and the case remanded to the Superior Court for a new trial on so much of the indictment as charges murder in the second degree. G. L. c. 278, § 33E (as amended by St. 1962, c. 453).

*So ordered.*