COMMONWEALTH *vs.* GAIL DEPRADINE.

No. 95-P-2087.

Suffolk. December 20, 1996. - March 28, 1997.

Present: LAURENCE, GILLERMAN, & FLANNERY, JJ.

*Homicide. Wanton or Reckless Conduct. Practice, Criminal,* Required find-
ing, Argument by prosecutor.

At the trial of an indictment for manslaughter, the evidence was sufficient
to warrant the conclusion beyond a reasonable doubt that the victim's
death did not come about as the result of an accident and to permit the
jury to find the defendant guilty of involuntary manslaughter, where a
reasonable person would have known that pointing a police officer's
gun at another and pulling the trigger would create the risk of substantial
harm. [405-408]

Certain closing remarks of the prosecutor at a criminal trial were proper
argument, or were not prejudicial, nor did they create a substantial risk
of a miscarriage of justice, considering the final argument as a whole
and in light of the judge's charge: the defendant's motion for a mistrial
was correctly denied and she was not entitled to a new trial based on the
prosecutor's remarks. [408-410]

INDICTMENT found and returned in the Superior Court
Department on December 30, 1993.

The case was tried before *Robert W. Banks,* J.

*Margaret A. Burnham* for the defendant.

*Katherine E. McMahon,* Assistant District Attorney (*James
W. Coffey,* Assistant District Attorney, with her) for the Com-
monwealth.

GILLERMAN, J. A Boston police officer (victim) was shot
dead in the early morning hours of December 8, 1993. After
a four-day jury trial, the defendant was found guilty of invol-
untary manslaughter. She appeals, claiming that the judge
erred in denying her motion for a required finding of not
guilty and that the prosecutor's summation prejudiced her
right to a fair trial.

We summarize the evidence in the light most favorable to the Commonwealth. The victim and the defendant were involved in a sexual relationship for more than a year. The victim saw the defendant about once a week. On the night of December 7, 1993, the victim went off duty about 11:30 P.M. He and other police officers went to Tim's Tavern where the victim telephoned the defendant. Sometime after midnight, following the departure of his companions, the victim left the tavern and went to the defendant's apartment in Boston.

At 1:51 A.M. on December 8, the defendant made a "911" call. She said, "Oh, my God, someone just got shot." She identified the victim as the person who was shot, and she added, "Get here right away."

At about 2:00 A.M. three police officers — Officers Cuddyer, Magoon, and Clark — received a radio dispatch directing them to the defendant's apartment. They arrived a few minutes later, and, as they went up in the elevator, Cuddyer heard a woman yelling, "Oh, my God. Oh, my God." Officer Cuddyer was the first one to speak to the defendant.[1] In response to his questions the defendant said, "We were playing with the gun and the gun went off." Officer Cuddyer, now joined by Officers Magoon, Clark, and Willis (who had just arrived), pressed for more details. The defendant added, "We were playing with the gun, he handed me the gun, and the gun went off." Officer Cuddyer asked for the gun. The defendant said, "I dropped it." Where did she drop it?, he asked. The officers looked around the living room and saw the gun against the exterior wall. Later, the defendant told Officer Magoon, "Oh my God. Oh my God. It was an accident."

Officer Clark also talked with the defendant. The defendant told him that it was an accident, that she and the victim were playing with the gun and it went off, that she was holding the gun when it went off, and that she and the victim were both standing in the living room when the gun went off.

The defendant told Officer Willis that she and the victim were "embracing . . . just playing" and then the victim said, "Do you want to kill me?" He removed the .gun from his holster and the gun went off, she said.

About 2:35 A.M., Sergeant Detective Keeler of the Boston

---

[1]At the commencement of the trial, the defendant waived objection to the admission in evidence of most of the statements made by the defendant to the police.

Police homicide unit arrived. The defendant told the detective about the arrival of the victim, their preliminary conversation regarding the victim's duty that evening, how they embraced one another, and that, after embracing, the victim took his gun out of the holster and said to the defendant, "Gail, do you want to kill me?" as he handed the gun to the defendant. The gun went off, and the victim stumbled toward the hallway where he was found. Sergeant Keeler continued to press for a more detailed explanation of what had occurred. At Sergeant Keeler's request, the defendant reenacted the scene with Sergeant Keeler acting as the victim. Sergeant Keeler observed, "She couldn't go any further. She couldn't demonstrate as to the mechanics, the actuality of [the victim] handing her the gun, of how the gun got into her hand, of how the gun went off."[2] "She just kept her hands to her side . . . and said, "I don't know. I don't know."

The gun was found to the right of where the victim would have been standing. An autopsy disclosed that a single bullet went through the victim's chest from front to back, passing through the aorta, the largest artery in the body. The weapon that fired the bullet was within inches of the victim's chest. The autopsy also disclosed that the victim's blood contained .12 grams of ethanol — equivalent to the consumption of approximately five ounces of straight whisky within approximately forty minutes to one and one-half hours before death, or sixty ounces of beer in the same period, according to the Commonwealth's expert witness who performed the autopsy. The victim was five feet, nine inches, tall, and weighed about one hundred seventy-five pounds.

Sergeant Spillane arrived at about 2:16 A.M. He was present while the defendant was being questioned by Sergeant Keeler in the living room. He acknowledged that the defen-

___

[2]After this portion of Sergeant Keeler's testimony, the defendant objected to his characterization of what the defendant did or could not do. There was a bench conference at the conclusion of which the judge noted the defendant's objection. There was no motion to strike this portion of Sergeant Keeler's testimony. See Liacos, Massachusetts Evidence § 3.8.1, at 87 (6th ed. 1994) ("A motion to strike is . . . the proper means of eliminating an answer that is objectionable either on substantive grounds . . . or on the ground that it is non-responsive"). The defendant's brief does not argue the objection except to the extent the prosecutor made use of this portion of Keeler's testimony in his closing argument, discussed *infra.*

dant never said she pulled the trigger, but he did see her gesticulate while she was answering Sergeant Keeler's questions. Sergeant Spillane reenacted the gestures, which counsel described for the record: "[Y]ou just took your right hand and stuck out your index finger and had your thumb in the air and were pressing it back and forth . . . ."

Officer Dennis Harris arrived about 2:50 A.M. While the defendant was answering Sergeant Keeler's questions, he saw her "squeezing her right index finger repeatedly while making the statements to Sergeant Keeler."

An expert witness for the Commonwealth testified that it took eight to eight and one-half pounds of pressure to pull the trigger of the gun. A police fingerprint expert was unable to make a print identification from the gun or any of the ammunition recovered from it.

A ballistics expert testified that a nine-millimeter Glock firearm — the weapon in this case — contains three internal safety mechanisms: the trigger guard, the firing pin safety, and the drop safety. The trigger guard, which is "located in the trigger" and protrudes from the trigger, prevents the trigger from being pulled back. The only way the trigger can be moved from a rigid position is by depressing the protruding safety lever; when the lever is depressed, the trigger may be pulled and the weapon fired. The firing pin safety prevents the firing pin from striking the cartridge until the trigger is pulled. The drop safety prevents the weapon from firing by any occurrence or accident other than by pulling the trigger. Thus, even with a live round in the chamber, the weapon cannot, under any circumstances, be fired except by first releasing the trigger guard. The expert also testified that Boston police officers are required to carry their weapons with a round in the chamber.

The ammunition clip for the Glock had a capacity of seventeen rounds of ammunition. Fourteen rounds were found in the victim's clip. The spent cartridge of a fifteenth round was found in the chamber; it had not been ejected properly.

The defendant did not testify. At the close of the Commonwealth's case, and at the close of all the evidence, the defendant moved for a required finding of not guilty. Each motion was denied.

The judge's charge was thorough, lucid, and accurate. The judge described voluntary manslaughter, involuntary man-

slaughter, the words "reckless or wanton," and the subjective and objective components of reckless or wanton conduct. The judge instructed the jury that "the Commonwealth must show that grave dangers to others were apparent and the defendant chose to run the risk rather than alter her conduct so as to avoid the act or omission which cause the harm. The standard of wanton and reckless conduct depends both on what the defendant knew and how a reasonable person would have acted knowing these facts." See *Commonwealth* v. *Welansky,* 316 Mass. 383, 398-399 (1944). He emphasized that, if the unintentional killing was the result of an accident which the Commonwealth did not disprove beyond a reasonable doubt, or of ordinary negligence or gross negligence, the jury could not find the defendant guilty.[3]

In this manner the case went to the jury to choose between an accident or manslaughter (voluntary or involuntary). It is also significant that, after beginning their deliberations, the jury returned to the court room twice with requests to be re-instructed: first, on the elements of voluntary and involuntary manslaughter and, second, on the definition of "accident."

1. *The defendant's motion for a required finding of not guilty.* The Commonwealth, as we have said, had the burden of proving beyond a reasonable doubt that the victim's death did not come about as the result of an accident. The pivotal issue is whether, as matter of law, the Commonwealth carried that burden. More particularly, "the crucial point [is] that proof of . . . [wanton or reckless conduct] depended on proof of the absence of accident." *Commonwealth* v. *Zezima,* 387 Mass. 748, 756 (1982), citing *Commonwealth* v. *Robinson,* 382 Mass. 189, 207 (1981).

The jury could have found these undisputed and critical facts. First, the defendant admitted being in possession, and thus control, of the firearm of the victim when it "went off." Second, the defendant and the victim were close to each other

---

[3]The defendant, having fairly raised the possibility of accident through the officers' testimony of the defendant's statements, see *Commonwealth* v. *Lowe,* 391 Mass. 97, 108, cert. denied, 469 U.S. 840 (1984), *S.C.,* 405 Mass. 1104 (1989), was entitled to an instruction that the Commonwealth had the burden of proving beyond a reasonable doubt that the shooting was not accidental. See *ibid.,* citing *Commonwealth* v. *Zezima,* 387 Mass. 748, 756-757 (1982). The judge so instructed the jury; he defined an "accident" and discussed it in detail — "an unexpected happening that occurs without intention or design on a person's part."

when the gun went off. Third, the victim was shot at very close range directly in the chest, and there were only two people in the room. Fourth, the victim's weapon could not have been fired without pulling the trigger. Expert testimony had established that the drop safety and the firing pin safety prevented the firing pin from striking the cartridge under any circumstances other than by pulling the trigger with approximately eight pounds of pressure after the trigger safety had been released. The victim's claim that the gun inadvertently "went off" conflicted with these uncontested facts.

The critical test for involuntary manslaughter is whether, in the circumstances known to the defendant, a reasonable person would recognize that the conduct under scrutiny "involves a high degree of likelihood that substantial harm will result to another." *Commonwealth* v. *Sires*, 413 Mass. 292, 303 n.14 (1992). "But even if a particular defendant is so stupid [or] so heedless . . . that in fact he did not realize the grave danger, he cannot escape the imputation of wanton or reckless conduct in his dangerous act or omission, if an ordinary normal man under the same circumstances would have realized the gravity of the danger." *Commonwealth* v. *Welansky*, 316 Mass. at 398-399.

The jury rejected the theory — clearly permitted under the judge's forceful instructions — that what occurred was an accident, and we are of the opinion that the evidence was sufficient to permit the jury to find the defendant guilty of involuntary manslaughter. The fact that there was no direct evidence that the defendant pulled the trigger, or that the defendant knew there was a live round in the chamber,[4] or that the defendant knew that the ammunition clip contained live rounds, is not dispositive. The jury could have inferred that the gun "went off" because the trigger was pulled, and that it was the defendant who, being in possession of the weapon, pulled the trigger when the forward end of the barrel of the gun was inches away from the victim's chest and the two were, as the defendant said, "embracing." The trigger-pulling gestures of the defendant, which the jury could have taken as self-incriminating, would reinforce these inferences. See *Commonwealth* v. *Gilbert*, 423 Mass. 863, 868 (1996) ("An infer-

---

[4]The trigger guard at some point had been released, obviously. When, and under what circumstances, is unknown. There was no evidence that more than one round was fired.

ence drawn from circumstantial evidence 'need only be reasonable and possible; it need not be necessary or inescapable' ").

From this, the jury were warranted in concluding that a reasonable person in the defendant's circumstances would have reason to know that a police officer's firearm would not be without live ammunition capable of being fired, and such a person would also recognize the gravity of the danger in pulling the trigger of a police officer's weapon when that weapon was pointed directly at a person's chest. Regardless of whether the defendant knew that the gun was ready to be fired when the trigger was pulled, the defendant should have known, as would any reasonable person, that the danger involved — the risk created by pulling the trigger of a police officer's weapon — was at least serious bodily injury to the victim. The victim's statement — "Gail, do you want to kill me?" — however construed, would not negate (and might emphasize) the danger of pulling the trigger. It was that danger, that risk of serious harm, which the defendant assumed. It is of no consequence that the defendant may have meant no harm to the victim. "Wanton or reckless conduct does not involve a wilful intention to cause the resulting harm." *Commonwealth* v. *Twitchell*, 416 Mass. 114, 122 (1993).

*Commonwealth* v. *McCauley*, 355 Mass. 554 (1969), bears on the facts of this case. In *McCauley* there was sufficient evidence to warrant the verdict of guilty of murder, but the court held that the judge erred in withdrawing the issue of involuntary manslaughter from the jury for the evidence did not require a finding of an intent to kill on either of two theories. Even if the jury in that case concluded from the evidence, as they might, that the defendant had reason to know that there was live ammunition in the clip, but did not know that drawing back the slide and releasing it would insert a live round in the chamber with the result that squeezing the trigger would discharge the weapon, then the evidence would warrant a verdict of involuntary manslaughter. *Id.* at 561. Alternatively, if the jury concluded that the defendant believed that the firearm was not loaded with live ammunition, or was ignorant of whether the gun was loaded, or was recklessly indifferent to whether the gun was loaded with live ammunition or not, then evidence that the defendant placed the gun at a person's head, pulled back the hammer, and

squeezed the trigger would support the conclusion that the defendant's conduct "tended to show . . . utter recklessness." *Ibid.* The evidence in this case justified the jury's verdict on either theory described in *McCauley.* Contrast *Commonwealth* v. *Bouvier,* 316 Mass. 489, 496 (1944) (manslaughter judgment reversed where "pertinent evidence would not warrant the jury in finding that the defendant knew or ought to have known that the gun was loaded," and the evidence would not support a finding that the discharge of the gun was other than accidental). See also *Commonwealth* v. *Wallace,* 346 Mass. 9, 12-13 (1963) (sufficient evidence of wanton or reckless conduct where the safety of the firearm was off, the gun was ready to fire, and "the defendant knew this . . .").[5]

We conclude that the evidence was sufficient to warrant the finding that the victim's death was not the result of an accident and the jury were warranted in returning a verdict of guilty of involuntary manslaughter. There was no error in the denial of the motion for a required finding of not guilty.

2. *The prosecutor's closing argument.* We comment briefly on the defendant's arguments regarding the prosecutor's summation. First, the defendant claims that the prosecutor improperly commented on the defendant's failure to testify. This claim turns on Sergeant Keeler's testimony regarding the defendant's response to his questions immediately following the shooting. See note 2, *supra,* and related text. The prosecutor's comments were not improper. The comments were directed to the defendant's conduct — her lack of responsiveness — immediately following the shooting and not on her failure to testify at the trial. See *Commonwealth* v. *Grant,* 418 Mass. 76, 83 (1994). Moreover, the judge repeatedly emphasized the presumption of innocence, the Commonwealth's burden of proof, and that no unfavorable infer-

---

[5]Cases from other jurisdictions support the result we reach in this case. See *Marasa* v. *State,* 394 So. 2d 544, 547 (Fla. App. 1984) (remanded for entry of judgment of manslaughter where defendant, erroneously thinking the gun was not loaded, pointed the gun at the victim, and pulled the trigger); *People* v. *Schwartz,* 64 Ill. App. 3d 989, 994-995 (1978) (conviction of involuntary manslaughter affirmed where defendant, even if he believed the gun was not loaded, pointed the gun at the victim, cocked the gun, and pulled the trigger); *People* v. *Hoover,* 250 Ill. App. 3d 338, 351 (1993) ("pointing a loaded gun at another constitutes recklessness because it is a gross deviation from the standard of care which a reasonable person would exercise").

ence could be drawn from the defendant's failure to testify.[6] The judge's denial of the defendant's motion for a mistrial based on these comments of the prosecutor was well within the discretion of the judge. There was no error.

The defendant argues that the prosecutor's remarks were inflammatory. The prosecutor referred to the fact that the victim "is dead. He's gone. He's not coming back. . . [The victim] bleeds like any of us . . . his family grieves like anyone else's family . . . . I wish I could portray to you in this courtroom on that stand, but it's impossible to, what [the victim] went through for the last twenty-five feet[7] of his life." We agree. These remarks did cross the line of permissibility even taking into account the jury's capacity to "discount hyperbole." *Commonwealth* v. *Anderson,* 411 Mass. 279, 287 (1991). The judge's instructions emphasized, however, that the jury were to determine the facts "without prejudice and without fear and solely from a fair consideration of the evidence that was admitted during the course of the trial . . . ." And he pointed out that the arguments of counsel did not constitute evidence. In the context of the judge's instructions and the jury's focus on the pertinent issues, indicated by their requests for reinstruction, the prosecutor's regrettable remarks were not so prejudicial as to merit reversal, see *Commonwealth* v. *Viriyahiranpaiboon,* 412 Mass. 224, 232 (1992), and there was no error in the denial of the defendant's motion for mistrial.

We have reviewed additional remarks by the prosecutor, none of which were objected to at the trial but which the defendant now identifies as requiring reversal of the judgment. While the prosecutor on several other occasions did make additional inappropriate remarks — such as exalting the credibility of the police officers because they were the police — we do not conclude that what the prosecutor said was so extreme as to constitute a substantial risk of a miscarriage of justice.

---

[6]For example, the judge said, "And I instruct you, you are not to draw any adverse inference whatsoever against the defendant for her election not to testify during the course of the trial. This is a basic constitutional provision that a defendant does not have to prove his innocence."

[7]Here, the prosecutor was referring to the distance from the location in the defendant's apartment where the victim was shot to the place where his body was found in the hallway outside the defendant's apartment.

We conclude that the prosecutor's summation, considered as a whole and in light of the strength of the judge's charge, was not improper. See *Commonwealth* v. *Anderson*, 411 Mass. at 287.

*Judgment affirmed.*