NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-143

COMMONWEALTH

vs.

MESSIAH LEGGETT.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a jury trial the defendant was found guilty of involuntary manslaughter, G. L. c. 265, § 13, and possession of a firearm without a license, G. L. c. 269, § 10 (a), in the shooting death of Nalijah Andrade, a high school senior with whom the defendant and his friends had been partying in a hotel room.  The victim and the defendant had been "play fighting" with a "ghost gun" in a corner of the room when the gun discharged, sending a fatal bullet through the victim's head. We affirm.

Background.  The jury could have found that four young men -- the defendant and his friend Kenny Jnley, along with two of Jnley's friends -- came to Boston one night to gather, drink,

hang out, and consume marijuana in two hotel rooms they had rented.  Jnley and his friends went to the hotel just before 7 P.M; the defendant arrived separately.  The four spent time in the room "[c]hilling, talking, smoking," playing with a gun, and making video recordings.

A "selfie" video recording taken around 9:30 P.M. depicted Jnley dancing, playing with a black and gray gun, which he pointed both at the recording device and at his own neck, displaying a paper cup full of a yellow-brown liquid, and singing.  (The version of the video recording played for the jury was muted on the order of the judge to prevent possible prejudice to the defendant.  The other "selfie" video recording discussed infra was also muted.)  In the video recording the defendant approaches from behind Jnley and joins in the dancing and singing.  From his position, the defendant had an unobstructed view of the gun.  While the defendant was in the frame, standing behind Jnley, Jnley removed a magazine from the handle of the gun and pointed the top of the magazine at the camera, revealing a gold-colored bullet inside.  The defendant's face was visible behind Jnley while Jnley, with the gun lifted to shoulder height, replaced the magazine in the gun's handle.

A group of four young women, including the victim, later joined the young men, and the eight continued drinking, smoking

2

marijuana, and playing with the gun.  The victim was among the people playing with the gun.  Eventually, the defendant, the victim, and three other people ended up in one of the two hotel rooms.  The defendant and the victim were in a corner of the room outside the bathroom, "play fighting" with their hands and talking.  The mood in the room was "[n]ormal."  There was no "rustling" or "grappling" noise from the corner where the defendant and victim were alone together.

A witness heard a gunshot from the corner.  The witness saw the victim on the floor with the defendant looking at her saying, "What did I do?  What did I do?  Oh, my God.  What did I do?"  According to the defendant, before the victim was shot, she was playing with the gun again.  He and Jnley told her to "chill."  The victim said, "I know you guys wouldn't really like wouldn't shoot it or stuff like that."  When asked by investigating officers, "Who had the gun when she was shot," the defendant responded, "Me, but like, well, she did first but then me."  Asked what happened to the gun after the shooting, the defendant responded, "I think I had it or I picked it up," and he "put it in the bathroom."

The gun was recovered.  It was a nine millimeter Polymer80 semiautomatic pistol with no serial number, a "ghost gun" modeled after a Glock.  Test-firing confirmed that it was a

3

working firearm that could fire a round fed from the magazine found near the victim.  It had a trigger safety, a small tab that had to be depressed at the same time the trigger was pulled to allow the firearm to fire.  The firearm did not have a "hairpin trigger," one that required only one to two pounds of pressure to fire.

Discussion.  1.  Sufficiency of the evidence.  We review the defendant's insufficiency claims, considering the evidence introduced at trial in the light most favorable to the Commonwealth, to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, Commonwealth v. Latimore, 378 Mass. 671, 676-678 (1979), bearing in mind that guilt may be established by circumstantial evidence "and that the inferences a jury may draw from the evidence 'need only be reasonable and possible and need not be necessary or inescapable.'"  Commonwealth v. Linton, 456 Mass. 534, 544 (2010), quoting Commonwealth v. Lao, 443 Mass. 770, 779 (2005), S.C., 450 Mass. 215 (2007).  In so doing, we are mindful that, "[w]ith few exceptions, the task of assessing the cogency of evidence and resolving conflicting testimony is the exclusive province of the fact finder."  Commonwealth v. Tanner, 66 Mass. App. Ct. 432, 437 (2006).

4

a.  Involuntary manslaughter:  "wanton and reckless" conduct.  "Involuntary manslaughter arises where death is caused by wanton or reckless conduct -- that is, 'intentional conduct that create[s] a high degree of likelihood that substantial harm will result to another person.'"  Commonwealth v. Njuguna, 495 Mass. 770, 781 (2025), quoting Commonwealth v. O'Brien, 494 Mass. 288, 297 (2024).  Proof of involuntary manslaughter does not require that the defendant "inten[d] to cause the specific harm," but only "inten[d] to engage in the wanton or reckless conduct itself."  Njuguna, supra.  The Commonwealth can prove intent "either subjectively, based on the defendant's specific knowledge, or objectively, based on what a reasonable person should have known in the circumstances."  Id.  "[T]he relevant inquiry is whether a defendant knew of facts that would cause a reasonable person to know of the relevant danger, or whether the defendant in fact knew of the danger."  Commonwealth v. Horne, 466 Mass. 440, 444 (2013).

The defendant stresses the absence of evidence conclusively demonstrating that he put the gun to the victim's head, knowing or suspecting it to be loaded, and pulled the trigger.  Instead, he emphasizes evidence from which the jury could have concluded that the victim herself held the gun and accidentally shot herself while he attempted to intervene and remove the gun for

5

her safety.  But in analyzing the sufficiency of the evidence, we must assess it in the light most favorable to the Commonwealth, rather than to the defendant.  See Latimore, 378 Mass. at 677.  Furthermore, the defendant asserted this accident theory at trial, and the judge appropriately and correctly instructed that "[t]he Commonwealth ha[d] the burden of proof to prove beyond a reasonable doubt that the death of [the victim] was not an accident."  She further explained that an accident "is defined as an unexpected happening that occurs without intention or design on the defendant's part," a "sudden, unexpected event that takes place without the defendant's intending it."  Finally, she instructed that an "accident is an unintentional event occurring through inadvertence or mistake or negligence," and that, if the Commonwealth failed to prove beyond a reasonable doubt "that what occurred was not an accident, then you must find the defendant not guilty."  See Commonwealth v. Lowe, 391 Mass. 97, 109-110 (1984).  "We presume that a jury follow all instructions given to it."  Commonwealth v. Watkins, 425 Mass. 830, 840 (1997).  In delivering a verdict of guilty, the jury necessarily considered and rejected the accident theory.

A "person who handles a dangerous weapon in such a manner as to make the killing or physical injury of another a natural

6

and probable result of such conduct can be found guilty of involuntary manslaughter, although he did not contemplate such a result."  Commonwealth v. Bouvier, 316 Mass. 489, 494 (1944). See Commonwealth v. Depradine, 42 Mass. App. Ct. 401, 407 (1997), quoting Commonwealth v. Twitchell, 416 Mass. 114, 122 (1993) ("It is of no consequence that the defendant may have meant no harm to the victim.  'Wanton or reckless conduct does not involve a wilful intention to cause the resulting harm'").

The evidence established that the defendant and the victim were alone together in a corner with a loaded firearm and were "play fighting."  Based on the "selfie" video recording from earlier in the evening, the jury could have inferred that the defendant either was aware or should have been aware that the gun could be loaded.  The defendant admitted that he was holding the gun when the victim was shot.  The firearms expert's testimony allowed the jury to conclude that the weapon's firing was not accidental.  The jury were also entitled to consider the defendant's cries of "What did I do?" after the shooting when considering his role.

The defendant makes much of the complex and contradictory evidence presented to the jury:  that the defendant, in his statement to investigators, said that the victim had been "pointing [the firearm] in the air and like joking and stuff"

7

before the shot was fired, that the defendant had no blood on his hands, while the victim did; that the scientific evidence about the bullet's downward trajectory and the human hair in the firearm's slide "equally supported the proposition" that the discharge of the weapon was an accident, or that the victim herself fired the weapon; and that the victim plausibly could have believed that the gun was not loaded. A jury could have heard this evidence and reached a different verdict, but this jury did not. See Commonwealth v. Miranda, 458 Mass. 100, 113 (2010)("To the extent that conflicting inferences may be drawn from the evidence, it is for the jury to decide which version to credit"); Lao, 443 Mass. at 779 ("If, from the evidence, conflicting inferences are possible, it is for the jury to determine where the truth lies, for the weight and credibility of the evidence is wholly within their province").

We are also unpersuaded by the defendant's argument that, if he was attempting to take a loaded gun from the victim, the conviction cannot stand. First, the jury were not required to interpret the evidence this way, and we view the evidence in the light most favorable to the Commonwealth. See Lao, 443 Mass. at 779. Second, when it comes to intent, an involuntary manslaughter conviction asks only whether "wanton [or] reckless conduct cause[d] death." O'Brien, 494 Mass. at 297, quoting

8

Commonwealth v. Simpson, 434 Mass. 570, 590 (2001). It is settled law that "[a] man may be reckless within the meaning of the law although he himself thought he was careful." Commonwealth v. Welansky, 316 Mass. 383, 399 (1944). When the defendant and victim were "play fighting" and had a loaded gun near the victim's head, the standard has been met. See Bouvier, 316 Mass. at 494; Commonwealth v. Griffin, 8 Mass. App. Ct. 276, 279 (1979) (affirming involuntary manslaughter conviction of defendant intending to "scare the victim" or "play a foolhardy game" by pointing firearm at victim's head and pulling trigger). We stress that this conclusion in no way touches on the defendant's motivation in the moment. Whether the defendant deliberately held the loaded firearm to the victim's head, as the Commonwealth asserted in its opening statement, or grappled with the victim in a well-intentioned effort to wrest the firearm from her, the evidence was sufficient, reviewed under the Latimore standard, to support the conviction.

b. Possession of the firearm. The defendant maintains that the evidence was insufficient to prove that he possessed the firearm. We again employ the Latimore standard, 378 Mass. at 677-678, and we again disagree.

To convict the defendant of unlawful possession of a firearm, the Commonwealth was required to prove that the

9

defendant, (1) possessed a firearm that (2) met the legal definition of a firearm, (3) knowing that he possessed or had control of a firearm, and (4) did not have a license to carry firearms.  G. L. c. 269, § 10 (a); Commonwealth v. Guardado, 491 Mass. 666, 690, S.C., 493 Mass. 1 (2023), cert. denied, 144 S. Ct. 2683 (2024).  The defendant challenges only the first element.

As outlined above, the evidence was sufficient for a jury rationally to conclude that the defendant was holding the firearm at the time of the shooting.  The defendant quoted the victim as saying she knew "they" would not shoot her, allowing an inference that he, not she, was holding the firearm when they were alone in the corner.  His reaction to the shooting was to ask, "Oh, my God.  What did I do?," a question the jury could have concluded established possession of the firearm.  Furthermore, the defendant told the police interviewers that he had possession of the firearm right before the shooting.  Taken together and viewed in the light most favorable to the Commonwealth, the evidence was sufficient to permit the jury to conclude that the defendant possessed the firearm.  See Depradine, 42 Mass. App. Ct. at 405-406 (affirming conviction for involuntary manslaughter where defendant admitted possession of firearm when it discharged; defendant and victim "were close

10

to each other" at moment of discharge; only two people were present in room; and testimony established that firearm could not have been fired without pulling trigger).  See also Commonwealth v. Hubbard, 69 Mass. App. Ct. 232, 234-237 (2007) (defendant's incriminating statements admitting to possession and independent evidence corroborating crime sufficient to establish defendant's possession of firearm).

2.  Detective's testimony.  The defendant challenges testimony by the lead investigator (detective) in response to the defendant's Bowden defense.  See Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980).  As the defendant timely objected, we review any error under the prejudicial error standard. Commonwealth v. Cruz, 445 Mass. 589, 591 (2005).  "This requires a two-part analysis:  (1) was there error; and (2) if so, was that error prejudicial."  Id.  "An error is not prejudicial if it 'did not influence the jury, or had but very slight effect . . . .'"  Id., quoting Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994).

"A Bowden claim refers to defendants' right to base their defense on the failure of police adequately to investigate [the crime] in order to raise the issue of reasonable doubt as to the defendant's guilt in the minds of the jury" (quotation and citation omitted).  Commonwealth v. Colon, 482 Mass. 162, 186

11

(2019).  When a defendant raises a defense under Bowden, "the Commonwealth may offer testimony about why the investigators chose the particular investigative path they did, in order to rebut that defense" (quotation and citation omitted). Commonwealth v. Wardsworth, 482 Mass. 454, 478 (2019).  "The permissible scope of rebuttal evidence depends, in part, on the issues raised by the defense; the more wide-ranging the defendant's attack on the police investigation, the broader the Commonwealth's response may be" (quotation and citation omitted).  Colon, supra at 187.

A central theme of the defense was attacking the law enforcement conclusion that the defendant had been handling the firearm when it discharged.  Unsurprisingly, the cross-examination of the detective explored his failure to pursue certain investigative steps that might have supported or conflicted with this conclusion, including distance determination testing, a shooting reconstruction, and gunshot residue testing of the victim's hands and clothing.  The redirect limned these same topics.  The detective testified that, based in part on his education and experience, the "stellate pattern" of the wound on the victim's head signified to him that the firearm was against her head when it discharged, so he had not requested the additional tests.

12

As the defendant argues, this testimony was inconsistent with the medical examiner's opinion that a star-shaped wound does not indicate "anything in particular as it relates to a head wound," and that she made no observations of either the exit or entrance wounds that "would be able to tell [her] whether or not this was a closer-contact wound."  The defendant attacks the detective's testimony as inadmissible expert opinion testimony, lacking a proper evidentiary basis, that the detective was unqualified to offer, even as part of a Bowden response.

When the "defendant has inserted into the case the relevance of the police judgment and decisions . . . the officer must be allowed to defend that judgment." Commonwealth v. Lodge, 431 Mass. 461, 467 (2000).  In such a case, "the prosecutor may proceed by inquiring of the officer the reason for each specific omission or decision."  Id.  "[T]he government cannot be precluded entirely from explaining why the action taken was correct in the circumstances."  Id.

This is what the prosecutor did here.  She followed the cross-examination by questioning the detective about why he did not take the additional investigative steps.  The experienced trial judge provided appropriate contemporaneous limiting instructions on several occasions in connection with the

13

detective's Bowden rebuttal testimony. "[J]urors are presumed to have followed the judge's instructions to disregard the evidence." Commonwealth v. Durand, 475 Mass. 657, 669 (2016).

Even if some of this testimony came close to or crossed the line into improper expert opinion -- a matter as to which we take no position -- there was no prejudice. "[I]n response to the jury's exposure to inadmissible evidence, the judge may correctly rel[y] on curative instructions as an adequate means to correct any error and to remedy any prejudice to the defendant" (quotation and citation omitted). Commonwealth v. Torres, 86 Mass. App. Ct. 272, 280 (2014). "Generally, provided the instructions are reasonably prompt and the jury do not hear the inadmissible evidence again, the error will be considered cured." Commonwealth v. Roe, 90 Mass. App. Ct. 801, 804 (2016), citing Commonwealth v. Kilburn, 426 Mass. 31, 38 (1997). So it was here.

3. Admission of exhibit 73; exclusion of other video evidence. Exhibit 73 was a "selfie" video recording taken the day before the shooting. It depicted both Jnley and the defendant in the front seat of a car, with Jnley waving a firearm that looked similar to the nine millimeter firearm used in the shooting. The defendant challenged its admission as prior bad act evidence, arguing that the fact that the defendant

14

had been present while Jnley brandished the firearm had little or no probative value and was simply propensity evidence. We review for abuse of discretion and reverse only if we encounter palpable error. See Commonwealth v. Corliss, 470 Mass. 443, 450 (2015), and cases cited.

The core of the defendant's argument is that the evidence was inadmissible because the central question before the jury "was whether [the defendant] would understand that attempting to take the firearm from [the victim] was more unsafe than allowing her to hold the gun to her head." This mischaracterizes the central jury question and ignores the Latimore standard under which we conduct our review.

We are not persuaded that the judge erred in assessing the prejudice in light of the probative value of the evidence. She concluded that exhibit 73 was admissible "for the limited purpose of demonstrating the defendant's access to and knowledge of firearms," and announced that she would give a limiting instruction. So she did; after exhibit 73 was played, the judge instructed the jury not to consider the video recording "as evidence or proof that [the defendant] has any kind of a criminal propensity or personality or bad character," but "solely on the limited issue of the defendant['s] . . . access to or knowledge of firearms." See Commonwealth v. Ridge, 455

Mass. 307, 323 (2009). She repeated these instructions in her final charge. Indeed, the Supreme Judicial Court has "often held that such evidence may be admissible to demonstrate the defendant's access to or familiarity with firearms." Commonwealth v. Andre, 484 Mass. 403, 414-415 (2020). The limited admission, combined with the judge's contemporaneous and final instructions, did not give rise to error.

The defendant also contends that the judge erred by excluding other video evidence that showed Jnley with a firearm similar to the one used in the shooting. The defendant was not depicted in these recordings. Asserting that, without these video recordings, he "could not demonstrate that the firearm was [Jnley's]," the defendant claims that he was deprived of the ability to "paint a full picture of the events for the jury," including that he did not bring the gun to the hotel.

The judge committed no error in excluding this evidence. The ownership of the firearm was not at issue in the case and was legally irrelevant to the charges being tried. While the defendant was charged with possessing the firearm, this charge related to the moments surrounding the victim's shooting, rather than his ownership.

4. Errors in closing. The defendant identifies what he views as three misstatements in the prosecutor's closing.

16

First, we agree that the prosecutor's attribution to the medical examiner of the testimony that a "stellate wound" signaled a close-contact wound was error.  This was the detective's testimony.  Second, the defendant is incorrect that there was no evidence to suggest that the victim's left hand was nondominant.  Her cousin testified that the victim was right-handed.  Third, the defendant challenges the prosector's argument that, after the shooting, the defendant "would have had to unwrap [the victim's] dead hand from" around the weapon to move it.

In analyzing a claim of an improper closing argument, we review for prejudicial error those statements as to which the defendant objected, Commonwealth v. Rosario, 430 Mass. 505, 515 (1999), and, as to the unpreserved claims, we review to determine whether any error created a substantial risk of a miscarriage of justice.  Commonwealth v. Alphas, 430 Mass. 8, 20 (1999).  "[T]he prosecutor's remarks must be viewed in light of the 'entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial.'" Commonwealth v. Rodriguez, 437 Mass. 554, 565 (2002), quoting Commonwealth v. Lamrini, 392 Mass. 427, 432 (1984). "Prosecutors may 'argue forcefully for the defendant's conviction.'"  Commonwealth v. Martinez, 476 Mass. 186, 199 (2017), quoting Commonwealth v. Wilson, 427 Mass. 336, 350

17

(1998). "The jury are presumed to understand that a prosecutor is an advocate, and statements that are '[e]nthusiastic rhetoric, strong advocacy, and excusable hyperbole' will not require reversal." Martinez, supra, quoting Wilson, supra at 351.

The defendant objected to the "stellate defect" testimony, and we therefore review the prosecutor's error for prejudice. We see none. The jury were instructed that their memory of the facts controlled and, further, that the statements of the lawyers were not evidence. Furthermore, there was ample other evidence of close contact between the firearm and the victim's head, which mitigated any prejudicial effect of this misstatement.

We similarly perceive no error in the prosecutor's statement about the defendant's removing the gun from the victim's hand. This statement was part of the prosecutor's argument about how the gun was removed from the hotel room after the shooting. The defendant had admitted to the police that he took the firearm from the room, and the prosecutor was responding to a defense argument that, consistent with the defense theory, the victim had been holding the gun when it discharged. The prosecutor's response was intended to cast doubt on this version of the shooting.

A prosecutor may "respond to the defense argument and also comment on the . . . weakness of the defense, as long as argument is directed at the defendant's defense and not at the defendant's failure to testify" (quotation and citation omitted).  Commonwealth v. Witkowski, 487 Mass. 675, 686 (2021).  Furthermore, "[i]n closing argument, prosecutors are entitled to marshal the evidence and suggest inferences that the jury may draw from it.  Those inferences need only be reasonable and possible" (quotation and citations omitted).  Commonwealth v. Roy, 464 Mass. 818, 829 (2013).  We perceive no error, and certainly no error that would give rise to a substantial risk of a miscarriage of justice.

Judgments affirmed.

By the Court (Desmond, Hershfang & Brennan, JJ.[1]),

Clerk

Entered:  June 12, 2026.

---

[1] The panelists are listed in order of seniority.