COMMONWEALTH *vs.* BEATRICE BOUVIER.

Hampshire.     December 6, 1943. — June 12, 1944.

Present: FIELD, C.J., LUMMUS, QUA, DOLAN, RONAN, WILKINS, & SPALDING, JJ.

*Homicide.   Wanton or Reckless Conduct.*

On evidence which at most showed that the discharge of a shotgun by a wife against the head of her husband as he lay asleep in bed, causing his death, was not intentional, but that it was discharged when, after kicking aside his clothing on the floor, she hurriedly "grabbed the gun" and bumped into something as she turned to leave the room, and did not show that she knew or ought to have known that the gun was loaded, a finding was not warranted that she was guilty of that wanton or reckless conduct necessary to a conviction of manslaughter.

INDICTMENT, found and returned on February 17, 1943.

The case was tried in the Superior Court before *Hammond,* J.

In this court the case was argued at the bar in December, 1943, before *Field,* C.J., *Donahue, Qua, Dolan,* & *Cox,* JJ., and after the retirement of *Donahue* & *Cox,* JJ., was submitted on briefs to *Lummus, Ronan, Wilkins,* & *Spalding,* JJ.

*W. F. A. Graham,* for the defendant.

*J. W. Heselton,* District Attorney, (*H. I. Grousbeck,* Assistant District Attorney, with him,) for the Commonwealth.

DOLAN, J. The defendant, Beatrice Bouvier, was indicted on February 17, 1943, for the murder of her husband, Rudolph N. Bouvier, on December 8, 1942. She was found guilty of manslaughter by the jury. The case comes before us on her appeal with assignments of error. G. L. (Ter. Ed.) c. 278, §§ 33A–33G, as amended.

The verdict of the jury makes it unnecessary, in view of the result we reach, to consider the defendant's assignments of error numbered 54 and 55 based upon the refusal of the judge to direct a verdict of not guilty of murder in the first and second degree. The consideration of the defendant's assignment of error based upon the denial of her motion for a directed verdict of not guilty of manslaughter will dispose of the case.

At the trial of the present case it was undisputed that the deceased husband of the defendant was killed instantaneously as the result of a gunshot wound inflicted as he lay asleep in his room in the house occupied by him and his wife and children, at about 2:45 A.M., and that the gun (a twelve gauge single barreled shotgun) was in the hand or hands of the defendant when discharged with the result just stated.

The testimony of the defendant would have warranted the jury in finding the following facts: On Sunday morning, December 6, 1942, the deceased went on a hunting trip with some friends. The day before he took his single barreled shotgun from the hallway in the first floor of the Bouvier house, where he usually kept it, after breaking it to see that it was not loaded. He brought it upstairs to his bedroom for the purpose of cleaning it, informing the defendant that

he would not use this gun on his trip but would use a double barreled shotgun which he had borrowed from a friend. The deceased and the defendant had two sons, one eleven years of age and the other ten years of age. Immediately before his departure on the hunting trip on the day above referred to, he cautioned his wife to "Keep the kids away from upstairs." He had never given her a similar warning before. As he was leaving he kissed the defendant good-bye and asked her to wish him luck. The defendant noticed the gun in the bedroom of the deceased on two occasions on the following day, Monday, December 7, upon going into his bedroom to remove and replace sheets and pillow cases. The gun was at the right hand side of the room. The defendant did not touch the gun on either of these occasions.

There was evidence that the bedroom of the deceased was located in the rear of the house on the southeast corner of the second floor and that it was directly over the bedroom of the defendant. His bedroom was to the left of the head of a staircase. The door leading to his bedroom was located in the northerly wall in the northwest corner. It swung inward and to the left. A double bed was placed parallel to the south and north walls and the head of the bed was against the westerly wall between the bedroom and a bathroom just beyond. The distance from the left side of the bed to the door was three feet six inches. The bed was four feet six inches wide. The room itself was about thirteen by ten feet in dimensions. The defendant's version of the shooting disclosed by her testimony, which was in accordance with what she ultimately told the police before the trial, was substantially as follows: The deceased returned from the hunting trip on Monday, December 7, at about 7:30 P.M. He talked with the defendant and his children. He had left the double barreled gun, which he had borrowed, on the porch and at his request one of his sons brought it into the house. The deceased "looked through" the gun as was his custom and left it in the first floor hall. The defendant offered to prepare supper for him, but he said "never mind. I know that you are not feeling good, and I will go down street." (The defendant was an expectant mother at the

time.) The deceased left the house saying that he would return "shortly after 8." At about 8:30 P.M. the defendant went to bed in her first floor bedroom. She had removed her shoes but was fully dressed otherwise. She knew that the baby was going to be born because she had "labor pains." The deceased returned to the house at about 2:30 A.M. the following day (December 8). The defendant was awake at the time and saw the deceased go into the kitchen. There was no conversation between the defendant and the deceased. The deceased sat down and took off his hunting shoes. The defendant heard him mumbling. She "mistrusted that he had been drinking." He then went upstairs to the bathroom and thence to his bedroom. The defendant heard sounds which indicated that he had gone to bed. About fifteen or twenty minutes later the defendant put on the light in the upper hallway and went upstairs to the bathroom. The door of the deceased's bedroom was open and glancing in the defendant saw him in bed. She saw the gun in the corner of the bedroom to the right of the doorway as one enters. Returning from the bathroom she looked into the deceased's bedroom and saw the gun again. The "wooden part" of the gun was against the floor. The barrel of the gun was leaning against the wall. The back of the deceased's head was resting on his pillow. He was sleeping, breathing heavily. The defendant knew that he kept "shells" in his room. The defendant "stepped into his room" a "step or two" and "went to take his gun out." She noticed "his clothes in a pile"; she kicked them aside and "took hold of the gun," and all she remembers was "I went to turn, and as I turned, I bumped something, and the gun went off, and it flew from my hands" and "I went downstairs." The defendant further testified that she "just grabbed the gun"; that she knew "his clothes were in the front somewhere . . . [she] kicked them aside . . . with . . . [her] foot"; that "at the time . . . [she] was watching him . . . Because . . . [she] didn't want to wake him up"; that she stooped over and took the gun off the floor; that when she had taken hold of it she thought that she started to turn to her left; that she thought it was then that

the gun bumped against something; that she thought that it was the muzzle of the gun "that hit"; that she did not know what it hit, but "it hit something that was up at the end of the muzzle," and when it hit the gun went off and it "flew from . . . [her] hands." She further testified that she ran downstairs and that she did not intend to shoot the deceased. There was evidence that after going downstairs the defendant knocked on a pipe which ran to a basement apartment occupied by one Mrs. Hare; that the defendant then went down cellar to that apartment; that Mrs. Hare responded and the defendant said to her, "Mrs. Hare . . . I think Pete shot himself" (the deceased apparently was commonly called Pete); that Mrs. Hare said to her, "'Did you go upstairs?' you know, up in his room," and the defendant replied, "No"; and that the defendant at the suggestion of Mrs. Hare went to "get" one Lapierre, a storekeeper in the vicinity. There was evidence that she told him that she did not know what was the matter with "Pete, . . . if he fell on the floor, or shot himself"; that Lapierre told her that it was "up to . . . [her] to call for the Chief," and declined to go with her; that the defendant then got in touch with a Mr. and Mrs. Labier; that the defendant said to Labier, "I think Pete shot himself . . . Will you go up and see?" and he said, "Certainly I will," and he did; and that when he returned the defendant asked him if it was true, and he replied, "It certainly is. He is dead."

There was evidence that when discovered after the shooting the body of the deceased was lying in bed with his head lying on its right side on the northerly pillow facing south and that there was a wound in his left temple; that this was the entrance wound; that the pellets traversed the head leaving a large open wound on the right side; that the shot was a contact shot; that the gun was held at an angle slightly less than vertical from the level of the bed when discharged; and that four "pellets" were found in the pillow directly beneath the head of the deceased. There was also evidence that during the day of December 8 the defendant went to the police station at Ware and stated that she did not know how the deceased had been killed but that she

thought it was accidental, and that on the next morning (December 9) she went to the Mary Lane Hospital in Ware, where on that day she gave birth to a son. She was interrogated before going to the hospital by the authorities and while a patient there. Ultimately she described the circumstances attendant upon the death of the deceased to the police in the same terms as those to which she testified before the jury.

The decisive question is whether the jury could have found properly on the evidence that the defendant was guilty of involuntary manslaughter by reason of wanton or reckless conduct on her part resulting in the death of the deceased. It is unnecessary to discuss that type of manslaughter denominated as voluntary, since in the present case there was no evidence that the defendant killed the deceased in "a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon a sudden combat." *Commonwealth* v. *Soaris*, 275 Mass. 291, 299, and cases cited.

It is settled in cases of homicide that one who wantonly or recklessly does an act that results in the death of a human being is guilty of manslaughter although he did not contemplate such a result. *Commonwealth* v. *Thompson*, 6 Mass. 134, 141. *Commonwealth* v. *Pierce*, 138 Mass. 165, 180, and cases cited. *Commonwealth* v. *Hawkins*, 157 Mass. 551, 553. *Commonwealth* v. *Arone*, 265 Mass. 128. *United States* v. *Freeman*, 4 Mason, 505. *Story* v. *United States*, 16 Fed. (2d) 342, 344. *State* v. *Pond*, 125 Maine, 453. This is so although the killing is not the consequence of an act that is unlawful for independent reasons apart from its likelihood to kill, since one may commit manslaughter by doing otherwise lawful acts recklessly. *Commonwealth* v. *Pierce*, 138 Mass. 165, 175. See also *Commonwealth* v. *Guillemette*, 243 Mass. 346, 347. And it has been held that a person who handles a dangerous weapon in such a manner as to make the killing or physical injury of another a natural and probable result of such conduct can be found guilty of involuntary manslaughter, although he did not contemplate such a result. *Commonwealth* v. *Hawkins*, 157 Mass.

551, 552–553. *Holder* v. *State*, 152 Tenn. 390, 392–393. *State* v. *Quick*, 168 S. C. 76. *Glover* v. *Commonwealth*, 260 Ky. 48. *Robertson* v. *State*, 153 Miss. 770. *Wilkerson* v. *State*, 123 Tex. Cr. 532. *State* v. *Trent*, 122 Ore. 444. Nothing more is required than the intentional doing of an act which by reason of its wanton or reckless character "exposes another to personal injury, and causes such an injury." *Commonwealth* v. *Hawkins*, 157 Mass. 551, 552–553, and cases cited. See Am. Law Inst. Restatement: Torts, § 500. In the cases cited just above, however, it is to be observed that the weapon was intentionally discharged by the defendant, whereas in the instant case, confining ourselves as we must to the evidence bearing on the issue of manslaughter and therefore putting out of the case all evidence tending to show intentional murder, we are of opinion that the jury would not have been warranted in finding that the defendant intentionally discharged the gun. The only theory upon which the crime charged could be manslaughter is that the killing was the unintentional result of wanton or reckless conduct on the part of the defendant, and whether the conduct of the defendant was wanton or reckless must be determined by the conduct itself and not by the resultant harm. See *Commonwealth* v. *Welansky*, *ante*, 383, and cases cited. In the present case the only intentional conduct so far as the issue of involuntary manslaughter is concerned consists of the defendant's action in kicking the deceased's clothes out of the way, and the hurried manner in which she "grabbed the gun" and started to leave his bedroom, bumping into something as she turned, with the result that the gun hit something and "went off," killing the deceased. While this conduct could have been found properly to have been negligent, it cannot be said rightly to have approached in character the wanton or reckless conduct essential to a finding of involuntary manslaughter, that is, an action on the part of the defendant in circumstances where she should have realized the gravity of danger to the deceased and, notwithstanding, as a result of choice on her part assumed the risk. In the circumstances disclosed by the evidence bearing on the issue before us we are also of opinion that it

cannot be said properly that one of ordinary prudence in acting as the defendant did would realize that there would be a high degree of likelihood that in so doing substantial harm would result to the deceased. The pertinent evidence would not warrant the jury in finding that the defendant knew or ought to have known that the gun was loaded.

Whether the conduct of the defendant which resulted in the killing was wanton or reckless must be determined upon her own testimony. On that testimony we think that it could not have been found properly that the discharge of the gun was other than accidental. The defendant's motion that the judge direct the jury to return a verdict of not guilty of manslaughter should have been granted.

*Judgment reversed.*
*Verdict set aside.*
*Case remanded to the Superior Court.*