COMMONWEALTH *vs.* JAMES A. ROY WALLACE.

Berkshire.    March 4, 1963. — May 2, 1963.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & KIRK, JJ.

*Homicide. Wanton or Reckless Conduct. Firearms. Evidence,* Res gestae, Admissions and confessions, In delinquency proceeding, In previous proceeding. *Arrest. Error,* Whether error harmful. *Words,* "Arrest."

A finding of involuntary manslaughter, but not of voluntary manslaughter, was warranted at the trial of an indictment by evidence respecting the defendant's handling of a shotgun which he knew was loaded and had its safety off and which discharged and inflicted fatal wounds upon a person who he knew was approaching him near by. [12–13]

At the trial of an indictment arising from a fatal shooting, evidence that when the victim's wife confronted the defendant a considerable time after the shooting she said "I could kill you" was not admissible as part of the res gestae or to give a "complete picture" of the shooting. [13–14]

A remark, "I could kill you," made by the wife of the victim of a shooting to the perpetrator thereof, not then under arrest, was not an accusation and the perpetrator was under no duty to reply thereto, so that his silence could not constitute an implied admission; and it was reversible error at the trial of an indictment against the perpetrator for the shooting to instruct the jury that if they found that "he should have replied to the remark" they could "regard his silence . . . as evidence of consciousness of guilt." [14–15]

At the trial of an indictment, testimony given in a previous proceeding against the defendant as a delinquent child under G. L. c. 119, §§ 52–59, dismissed under § 61, would not be admissible by reason of § 60; but

testimony given in a proceeding against the defendant on a criminal complaint under § 75 would be admissible if otherwise competent. [15–16]

One being questioned by police at a police station after having perpetrated a shooting might be found to be under arrest if he was not free to leave and would have been physically detained had he tried to leave, even if the police did not expressly declare that he was under arrest. [16–17]

Statements made by a sixteen year old boy to police while under arrest at a police station were not rendered inadmissible at the trial of an indictment against him merely by failure of the police to comply with G. L. c. 119, § 67, requiring that the probation officer and one of the boy's parents be notified immediately of his arrest. [17]

INDICTMENT found and returned on June 21, 1961.

The case was tried in the Superior Court before *Noonan, J.*

*John N. Alberti (Paul A. Tamburello & George N. Tobia* with him) for the defendant.

*Clement A. Ferris,* Assistant District Attorney (*Leonard E. Gibbons,* Assistant District Attorney, with him), for the Commonwealth.

SPALDING, J. On November 26, 1960, in Pittsfield James Pringle was wounded by the discharge of a shotgun in the defendant's possession. On December 3, 1960, Pringle died from a "massive pulmonary embolism" which, according to the medical evidence, was the result of the shotgun wounds. Since the defendant was sixteen years of age at the time of the shooting, a delinquency complaint was brought against him in a District Court. See G. L. c. 119, §§ 52–59. The judge of the District Court, being of opinion that the defendant should be dealt with on the criminal side of the court rather than as a delinquent child, dismissed the delinquency complaint. § 61. Thereupon, the defendant was brought before the District Court on a criminal complaint made under § 75. Following a hearing on this complaint the defendant was indicted for murder in the second degree. See § 80. He was found guilty of manslaughter and he brings the case here by appeal with numerous assignments of error. G. L. c. 278, §§ 33A–33G.

There was evidence of the following: Early in the afternoon of November 26, 1960, the defendant, armed with a double-barrel shotgun, decided to go to the Morewood Lake

area in Pittsfield to hunt squirrels. On the way he met a friend, William Hall, who went along with him. In going toward Morewood Lake they entered the grounds of Miss Hall's School; no permission had been given to either the defendant or his companion to hunt on the school grounds. While there they saw a squirrel which the defendant fired at. The defendant then reloaded his gun. At this point Hall, who was some distance away when the shot was fired, joined the defendant and informed him that a car was coming. As Hall ran from the area his hat got caught on a bush which was located on a knoll. The defendant followed Hall and, when he had reached the knoll, crouched down. While in this position the defendant heard the approaching car come to a stop, and also heard somebody get out of it. This person proved to be James Pringle, the caretaker of Miss Hall's School.

Mrs. Pringle, who had accompanied her husband, testified that upon getting out of the car her husband "walked over to where he saw the boy, and as he walked, the boy [holding a gun] arose from [a crouched position] behind a knoll," and she heard the boy say, "Don't move." Immediately thereafter "[t]he gun went off, and . . . [her] husband went down." According to Mrs. Pringle there was a "clear view" of the boy when she observed him. There was evidence that Pringle was no more than fifty to seventy-five feet from the defendant when the gun was discharged. The defendant then ran to where Hall was standing and told him that he thought he had accidentally shot a man in the foot and said, "Let's go." The defendant and Hall thereupon left the area. After they had proceeded for some distance, Hall suggested to the defendant that they return to the scene of the shooting. While returning, they encountered a police car and the defendant "flagged . . . [it] down," informing the officer that he had accidentally shot someone. Both the defendant and Hall got into the police car and proceeded to the scene of the shooting.

The defendant's version of the shooting was in substance this: When he got to the knoll he saw Hall's hat which had

caught on a bramble bush.   As he squatted down to get the
hat, the stock of the gun was resting on his hip with the bar-
rel pointed straight up, and he had his fingers on the trig-
gers.[1]   The safety was in the off position so that the gun
could be fired by merely pressing the triggers.   When the
person who had gotten out of the car came toward him, he
told him to stay where he was and then tried to ''break the
action of the gun.''   He tried to make the gun safe by mov-
ing the top lever over toward the right with his thumb.   In
attempting to ''get out of the bramble bushes'' he jumped
up and wheeled around to his right; the gun muzzle dropped
and the left barrel was discharged by reason of pressure
exerted on the rear trigger.

1.   The defendant requested the judge to instruct the
jury that there was no evidence to warrant a verdict of
manslaughter.   This request was refused subject to the de-
fendant's exception.   Assignment of error No. 10.   See
*Commonwealth* v. *Devereaux,* 256 Mass. 387, 393–394; *Com-
monwealth* v. *Bouvier,* 316 Mass. 489.   The judge instructed
the jury with respect to voluntary manslaughter.   Doubt-
less he did so to differentiate that offence from murder and
involuntary manslaughter.   But there was no evidence of
voluntary manslaughter (see *Commonwealth* v. *Bouvier,*
316 Mass. 489, 494) and the judge, if he mentioned the sub-
ject at all, should have told the jury that there was no evi-
dence of the offence.

There was, we think, sufficient evidence to warrant a find-
ing that the defendant's handling of the shotgun was wan-
ton or reckless and indicated such a ''disregard of probable
harmful consequences to another'' as to constitute invol-
untary manslaughter.   *Commonwealth* v. *Welansky,* 316
Mass. 383, 397.   *Commonwealth* v. *Bouvier,* 316 Mass. 489,
494–496.   *Commonwealth* v. *Atencio,* 345 Mass. 627.   The
defendant was in control of a highly lethal weapon which,
because of the attendant danger, called for a correspond-
ingly high degree of care in its handling.   At the time of

---

[1] The gun had two triggers; the forward trigger discharged the right barrel
and the rear trigger discharged the left.

the shooting the safety was off and the gun was ready to fire. The defendant knew this and he also knew that a person was near by who was headed in his direction. He had had ample time to put his gun in the safe position before Pringle came within close range, or so the triers of fact could have found. They could have rejected the defendant's evidence tending to show that the discharge of the gun was either accidental or negligent. Indeed, the evidence of the high concentration of shot which pierced Pringle's midriff, when considered with his wife's testimony that the defendant faced the deceased and told him to stay where he was would warrant the jury inferring that the defendant, though not intending to kill, pointed the gun at Pringle and, while so pointed, it in some manner went off.[2] Certainly, on such a hypothesis the defendant's conduct could be found to be wanton or reckless. The principles governing involuntary manslaughter have been fully discussed in the leading case of *Commonwealth* v. *Welansky,* 316 Mass. 383, and need not be restated.

The defendant relies heavily on *Commonwealth* v. *Bouvier,* 316 Mass. 489. But there is at least one very significant difference between the facts in that case and those here. As we said in the *Bouvier* case, "The pertinent evidence would not warrant the jury in finding that the defendant knew or ought to have known that the gun was loaded" (p. 496). Here the defendant knew that he was handling a loaded gun.

2. Shortly after the shooting the defendant and his companion were brought to the scene of the shooting in a police car operated by Officer Noon. Upon their arrival Mrs. Pringle asked Officer Noon, "which boy had done it." The officer pointed out the defendant, and Mrs. Pringle said, "Let me at him; I could kill you." This evidence when first introduced was admitted over the defendant's objection and exception. On numerous occasions later in the trial, this evidence came in without objection. Thus, viewed as an evidentiary ruling the admission of this state-

---

[2] There was evidence that a shell of the type used by the defendant contains approximately 254 pellets and that 148 entered Pringle's body.

ment would not be ground for reversal.  But, as we shall
presently demonstrate, it ought not to have been admitted.
The utterance was not admissible as a spontaneous declara-
tion, for it was made a considerable time after the killing.
*Rocco* v. *Boston-Leader, Inc.* 340 Mass. 195, 196–197.  "[I]t
was no part of any material fact or act."  *Commonwealth*
v. *Chance,* 174 Mass. 245, 250.  Nor does it appear that it
"would give a 'complete picture' of an event otherwise in-
complete."  *Commonwealth* v. *Snyder,* 282 Mass. 401, 418.
The Commonwealth urges that the statement was admis-
sible under the rule that "[t]estimony that a criminal de-
fendant (not under arrest) remained silent when an accu-
sation against him was made in his presence is competent
as an implied admission if it be shown that he heard and
understood the accusation and if the accusation concerned
matters within his knowledge which it would have been
natural for him to deny."  *Commonwealth* v. *Burke,* 339
Mass. 521, 532.  Clearly, this is not the kind of statement
to which the defendant could be expected to reply.  *Com-
monwealth* v. *Boris,* 317 Mass. 309, 318.  *Mendelsohn* v.
*Leather Mfg. Corp.* 326 Mass. 226, 238.  The fact that the
defendant had shot Pringle was not in dispute; the defend-
ant had already told the officer that he had shot someone,
although he contended it was accidental.  Mrs. Pringle's
feelings of animosity toward the defendant had no bearing
on his guilt or innocence.  It was in no sense an accusation;
rather it was the excited emotional reaction of a wife who
had just witnessed the shooting of her husband.  The de-
fendant was under no duty to reply to such a statement and
his silence cannot be regarded as an admission.  If the mat-
ter had rested merely on the erroneous ruling, the error,
for the reason indicated above, would not have required
reversal.

But the manner in which the judge dealt with this evi-
dence in his charge is another matter.  The judge, refer-
ring to Mrs. Pringle's remark ("I could kill you"), in-
structed the jury with respect to admissions by silence and
said, "If you say that . . . [the defendant] would probably
remain silent, then you will disregard . . . [the] remark,

and will not accept it as evidence. On the other hand, if you say that he should have replied to the remark and failed to, then you may regard his silence and his conduct as evidence of consciousness of guilt.'' The defendant duly excepted to this portion of the charge and his thirty-fourth assignment of error is grounded on this exception.

We are of opinion, for the reasons mentioned above in discussing the admissibility of this evidence, that this instruction was error and we cannot say that the error was harmless.

There are numerous other assignments of error but we shall discuss only those that are likely to arise in a subsequent trial and are of sufficient importance to merit discussion.

3. Throughout the trial the defendant excepted to the admission of evidence introduced by the Commonwealth as to what certain witnesses, including the defendant, had testified in the District Court. General Laws c. 119, § 60, provides in part, ''An adjudication of any child as a wayward child or delinquent child under sections fifty-two to fifty-nine, inclusive, or the disposition thereunder of any child so adjudicated, or *any evidence given in any case arising under said sections, shall not be lawful or proper evidence against such child for any purpose in any proceeding in any court,* and records in cases arising against any child under said sections shall not be received in evidence or used in any way in any such proceeding, except in subsequent proceedings for waywardness or delinquency against the same child and except in imposing sentence in any criminal proceeding against the same person . . .'' (emphasis supplied). Ordinarily what a party has said in some prior judicial proceeding which is in the nature of an admission or an inconsistent statement may be shown in a subsequent proceeding. *Flye* v. *Hall,* 224 Mass. 528, 530. *Brown* v. *Metropolitan Transit Authy.* 341 Mass. 690, 695, and cases cited. But the statute just quoted provides that in a delinquency hearing under §§ 52–59 ''any evidence given . . . [in such a case] shall not be lawful or proper evidence against such child for any purpose in any proceeding in any court.'' It would be dif-

ficult to conceive of language more unambiguous and comprehensive. As stated earlier, there were two proceedings in the District Court in which the defendant was involved. The first was a hearing on a delinquency complaint under § 54. The second was a proceeding on a criminal complaint under § 75. There can be no doubt, in view of § 60, that any evidence given at the delinquency hearing would not be admissible against the defendant. On the other hand evidence introduced at the hearing on the criminal complaint, if otherwise competent, would be admissible. Section 60 prohibits only evidence given in a proceeding arising under §§ 52–59. From the transcript, it is impossible to know whether the evidence objected to was given at the delinquency proceeding or at the subsequent criminal proceeding. Thus, we cannot say that the judge erred in admitting it. What we have said will be pertinent on a retrial of the case.

4. The defendant excepted to the exclusion of questions attempting to ascertain whether the officers who detained and questioned him had complied with G. L. c. 119, § 67. This section provides in part that ''Whenever a child between seven and seventeen years of age is arrested . . . the officer in charge of the police station . . . to which the child has been taken shall immediately notify the probation officer of the district court within whose judicial district such child was arrested and at least one of the child's parents . . . .'' The judge ruled that this statute had no application since the defendant had not been placed under arrest. Though the police did not declare that the defendant was under arrest, the officer in charge of the police station testified that the defendant would not have been free to leave until the investigation had been completed and implied that the defendant would have been detained physically had he tried to leave. There is no magic in the word ''arrest''; the detention of the defendant and his submission to the control of the officers are the controlling factors. *Commonwealth* v. *Holmes,* 344 Mass. 524, 526, and cases cited. We are of opinion that it would be unrealistic to say that the defendant was not under arrest when questioned at the

police station, and we shall deal with the case on the footing that he was.

During the trial the defendant did not set forth his reasons for pursuing this line of questioning. But in this court he contends that the failure of the arresting authorities to notify immediately at least one of the parents of the defendant and the probation officer as prescribed by § 67 rendered inadmissible all statements made by the defendant to the police while being detained at the station.[3] Notwithstanding the rule in *Commonwealth* v. *Haywood,* 247 Mass. 16, 18, which has been criticised, we assume that the defendant's statements would, because of his youth, be accorded the safeguards applicable to confessions. See Maguire, Evidence of Guilt, § 3.03, and cases collected in note 14. We do not, however, interpret this statute to mean that the failure to notify immediately at least one of the parents of the defendant and the probation officer renders his statements at the police station per se inadmissible. A reading of the entire section demonstrates that its purpose is to set forth the appropriate incarceration procedures for juvenile offenders. In fact, the statute, after requiring notice to the probation officer and a parent, authorizes the officer in charge of the police station to "inquire into the case." And " [p]ending such notice and inquiry, such child shall be detained."

A violation of this statute, however, accompanied by lengthy questioning by the police would be an important factor to be considered in determining whether a detained juvenile had been overreached or coerced by the police in the obtaining of a statement constituting a confession or an admission. We hold only that a violation of the statute in and of itself does not render a statement inadmissible, if otherwise competent.

5. The judgment is reversed and the verdict is set aside.

*So ordered.*

---

[3] The defendant while at the police station gave two signed statements to the police. While these were mainly exculpatory, they did contain statements which could be classed as admissions.