Agnes, Peter W., J.
I.INTRODUCTION
1. The defendant, Alissa Pugh, is charged by an indictment in two counts with Manslaughter (G.L.c. 265, §13) and unlawfully conveying away a dead body (G.L.c. 272, §71).[1] These criminal charges stem from the gruesome discovery of the mangled body of an infant boy in the “hopper” of a rubbish disposal truck on January 6, 2007. One of the truck personnel discovered the body as he was loading trash into the truck’s hopper as it made its rounds in the vicinity of Purchase and Camp streets in Milford. The child’s head was in a plastic shopping bag. The body appeared to have been partially compacted by the truck’s machinery. The ensuing police investigation led to a single-family home at 263 Purchase Street. The police learned (and there is no dispute), that the infant was born five days earlier to the defendant, who resided at that address with her boyfriend, her then 8 1/2-year-old son Colby, and her boyfriend’s aunt, while unattended and in her bathroom. The circumstances of the birth and the defendant’s conduct during and after the birthing process form the basis of the criminal charges.[2]
II. FINDINGS OF FACT
2. While it is not necessary for the court to make specific findings of fact in a jury-waived criminal case, I make such findings in this case as are necessary to resolve alternative theories of criminal liability presented by the evidence and to explain the reasoning of the court. Many of the facts are not in dispute. The court heard the testimony of nine witnesses including Dr. Henry Nields, Acting Chief Medical Examiner of the Commonwealth of Massachusetts, Dr. Drucilla Roberts, a Perinatal Pathologist at Massachusetts General Hospital, Dr. Richard T. Calleiy, Chief Medical Examiner of the State of Delaware, Trooper John Conron of the Massachusetts State Police, Detective Richard Belanger of the Milford Police Department, Christina Voss of Upton, Jacquelyn Meade of Mendon, Kathleen Clandyn of Fitchburg, and Erin Beech of Oakham. The following findings of fact are based on the court’s assessment of the credibility of each witness who testified. Additionally, the court has carefully examined the exhibits which consist of numerous photographs of injuries sustained by the child and video and audio recordings of three interviews of the defendant by the police in the days following discovery of the child’s body.[3]
3. The defendant did not testify. The only direct evidence of the events surrounding the birth of the child come from statements made by the defendant to the police. On the evening of January 6, 2007, the state and local police responded to the defendant’s home at 263 Purchase Street. The police spoke to Jason Schiappucci, the defendant’s boyfriend and Joanne Schiappucci, his aunt, and learned that the defendant was at her father’s home. The defendant was called and agreed to return home. The home had belonged to Jason’s mother. The defendant did not pay rent to anyone. After being informed of the discovery of the body of the baby boy, she told the police she had not given birth and was not pregnant, and that she was in her menstrual cycle. The defendant, Jason and his aunt all agreed to give the police samples of their DNA. No arrests were made at that time. The parties agree and have stipulated that lab tests of these DNA samples establish that the defendant and her boyfriend are the biological parents of the child.
4. Based on all of the credible evidence, I find that Alissa Pugh gave birth to a baby boy in the late afternoon or early evening hours of January 2, 2007 at 263 Purchase Street, Milford, Massachusetts while alone and inside her bathroom. During the birthing process, the child suffered a series of injuries described more fully below when the defendant pulled his foot and grabbed other parts of his body, including his abdomen, to forcibly release him from the breech position in which he presented. Certain other injuries were suffered by the child that were not established to be antemortem or that were established to be postmortem. There is no evidence that the child suffered from any anatomical anomalies or diseases at birth that could have accounted for or contributed to his death. The defendant gave birth to her first son in a hospital setting and while attended by physicians and nursing personnel on July 4, 1998. The defendant received prenatal care through the Fallon Clinic, including appointments with an OB/GYN physician which was covered as a result of Mass. Health Insurance. The defendant reduced her smoking and stopped drinking during her pregnancy. I do not credit the defendant’s statements to the police that she reduced her smoking and drinking as she had during her first pregnancy once she discovered she was pregnant in 2006. The defendant was about three days ahead of her due date *330 with her first child. She gave birth vaginally with the assistance of an episiotomy, a surgical enlargement of the vulval orifice to aid in the deliveiy process, due to the length of the labor. She was informed by the doctors that it may be necessary for her to have a Cesarean section, and then “bearing down” to push the baby out herself. Her “water” was broken by medical staff at the hospital.[4] She also recalled that she had attended birthing classes during her pregnancy where she learned about various ways in which babies may be born, and, among other things, that a “breech birth” refers to when the baby is positioned feet first in the birth canal at the time of delivery. She also learned that a Cesarean section is commonly done when a baby presents itself in the breech position at the time of delivery, and that a baby should not be delivered when it is in the breech position because it involves a high degree of risk to the child.
5. Sometime in 2006 the defendant became aware that she was pregnant as a result, in part, of using a home pregnancy testing kit.[5] Her last period before the birth of the baby in question was in April 2006. The defendant did not inform anyone else that she was pregnant. She has been in a monogamous relationship with her boyfriend except for a brief sexual relationship with another man in April-May 2006.[6] Her relationship with her boyfriend in the fall of 2006 was not good. He was not working and she was supporting a household made up of four people. The defendant was in financial distress. She had only a high-school education. She was employed as a veterinary technician at an animal hospital. Her relationship with her boyfriend improved somewhat in December 2006 when he found part-time work at the post office.
6. The defendant was an occasional patron at a bar in Milford known as the Marchiegiano Club. The defendant’s boyfriend Jason was a regular patron at this bar. On several occasions, including a date in October 2006, December 9, 2006 and December 30, 2006, the defendant was observed to be drinking alcohol (on one occasion as much as six shots) and smoking cigarettes, and was intoxicated on at least one of those occasions. She was overheard by other patrons, including the bartender, to state that she and her boyfriend were not going to have any more children.[7]
7. During 2006 and until the day in question, the defendant did not have any health insurance. She had health insurance when her son was born in 1998 but it lapsed. She was reminded that she lacked insurance for her son when he attended kindergarten, but she took no steps to apply for Mass. Health insurance or any other such insurance coverage for herself or her son. From the time the defendant first became aware she was pregnant until the birth of the baby boy on January 2, 2007, the defendant did not seek or receive any prenatal care and had not seen a doctor in years.
8. On January 2, 2007, the defendant went to work at the Milford Animal Hospital at 12:00 p.m. At about 3:00 p.m., she began to feel pains in her abdomen which she recognized as contractions. From her experience with the birth of her first son, she understood that contractions were associated with the birth of a child. She reported only that she was not feeling well and went home at 4:00 p.m. The defendant told her boyfriend and her aunt that she did not feel well and they left her alone. The defendant went to her bedroom and lay down. She was in and out of the bathroom several times. The contractions continued. At some point, the contractions were about one minute apart. The defendant did not call for help to her boyfriend who was at home, to her aunt who was upstairs, or to anyone else. Although the home telephone was not working, there was at least one working cell phone in the home. At some point she went into the bathroom and her “water” broke. From the birth of her first son she understood that the discharge of “water” was a step in the birthing process. There was some additional discharge from her vagina. The defendant did not call for help to her boyfriend who was at home, to her aunt who was upstairs or to anyone else. An interval of time of at approximately forty-five minutes in duration passed from when the defendant arrived home until her water broke and all the while she was having contractions.
9. After her water broke and while in the bathroom, the defendant reached inside herself and felt a foot. The defendant pulled the baby’s foot and then a leg appeared. She pulled the baby’s legs and abdomen and other parts of the baby’s body to hasten the process of delivery. The defendant knew that it was dangerous to deliver a baby feet first. She had to push ten times in addition to pulling. At one point, the baby seemed to be stuck inside the defendant. The defendant remained conscious throughout this period of time. Eventually, after about six minutes of pulling coupled with pushing by the defendant, the baby emerged from the mother and fell into the toilet bowl. It is unclear what followed immediately after the actual birth of the baby and, therefore, I make no findings as to what the defendant did or did not do in the moments immediately following the delivery other than a finding that she did not call out for help or phone for help. The defendant was able to stand and move about while she was in the bathroom before the delivery and immediately thereafter. At some point shortly after the delivery, the defendant became aware that the baby was dead. The defendant put the baby in a plastic bag which she found in the bathroom and brought it outside and put it in a gray trash container. She then returned to the bathroom, cleaned herself and the bathroom, and took the baby outside and deposited it in a trash can behind the house. The defendant used pads to soak up her own blood and bodily discharges. The defendant said nothing to her boyfriend or his aunt that evening. She went to work the following day.
*331 10. Based on the testimony given by Dr. Nields, Dr. Roberts, and Dr. Callery, I find that on January 2, 2007, the baby in question was nearly full term at 36 1/2 weeks and viable, that is capable of living outside of the mother’s womb. I also find from all the evidence that the baby was viable during the birthing process and up to the point when the defendant began to pull it out. The baby was 21 3/4 inches long and weighed 6 1/2 pounds despite the fact that most of its brain was missing. There was no evidence of a diseased or abnormal placenta or umbilical cord, an infection, or the presence of illegal drugs in the baby’s system. I further find that apart from the postmortem injuries caused by the trash compactor into which the baby had been dumped along with other trash, and certain other injuries that the medical experts could not determine to be antemortem or postmortem, the baby suffered a series of injuries before death and during the birthing process which are depicted in exhibits la to lh. I credit the testimony of the expert witnesses who opined that injuries to the child’s body characterized by the presence of “abundant” amounts of blood or hemorrhaging in the areas of injury can be regarded as antemortem or prior to death. The areas of these prior-to-death injuries include the area underneath the scalp, the neck, the right and left lobes of the liver, and the tissue around the testicles. These antemortem injuries resulted in a substantial amount of bleeding into the abdominal cavity. I find that these injuries did not occur before birth and while the baby was in his mother’s uterus. From other findings made above, I infer that these prior-to-death injuries were caused by the defendant pulling at the baby boy’s legs and grabbing other parts of his body with significant force in an effort to accelerate the process of delivery. I find that at least some of these injuries required the application of a significant amount of force such as pressing down hard with a person’s thumb or a hard clamping down on the defendant’s abdomen. I find that the baby boy in question did not die of natural causes.
12. There are some facts that I conclude the Commonwealth has not proved beyond a reasonable doubt. First, the Commonwealth has not proved precisely when in 2006 the defendant first became aware she was pregnant. Second, the Commonwealth has not proved that the baby was alive, i.e., had a heart beat or was breathing on its own when it fully emerged from the defendant and was fully delivered. Third, it is left to speculation and thus not proved that the baby would have lived if the defendant had called for help when her water broke and she first felt the baby’s foot.[8] Although there is evidence of some air in the baby’s lungs, it is left to speculation and thus not proved that it was the result of respiration on the part of the baby or due to some other cause.
13. Based on a consideration of all of the evidence, I find that the defendant caused the death of her baby boy on January 2, 2007 during the birthing process as a result of applying significant force to various parts of his body, that at the time of her acts she was aware that her conduct involved a high degree of risk to the life of the baby, that her conduct was not undertaken to save the life of the baby or her own life, and that her conduct was not the result of a mere mistake of judgment about what conduct was reasonable and appropriate under the circumstances.
RULINGS OF LAW Involuntary Manslaughter[9]
14. In a jury-waived trial, the rulings of law serve the purpose of instructions in a jury trial and explain the law applied by the court to the facts. The Commonwealth outlined three alternative theories of criminal liability for the offense of involuntary manslaughter in its closing argument. First, the Commonwealth alleges that the defendant is guilty because she failed to summon emergency medical assistance at least upon feeling the baby’s foot. Second, the Commonwealth alleges that the defendant is guilty because she acted to pull the baby out of her body without first requesting emergency medical assistance. Third, the Commonwealth alleges that the defendant is guilty because she did act reasonably to care for her newborn baby boy after delivery. The Commonwealth must prove beyond a reasonable doubt every essential element of the offenses charged against the defendant. See Commonwealth v. Harrington, 379 Mass. 446, 452-53 (1980), and cases cited.
15. Involuntary manslaughter is “an unlawful homicide, unintentionally caused ... by an act which constitutes such a disregard of probable harmful consequences to another as to constitute wanton or reckless conduct.” Commonwealth v. Catalina, 407 Mass. 779, 783 (1990), quoting Commonwealth v. Campbell 352 Mass. 387, 397 (1967). “The essence of wanton or reckless conduct is intentional conduct, by way either of commission or omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another.” Commonwealth v. Welansky, 316 Mass. 383, 399 (1944). “To constitute wanton or reckless conduct, as distinguished from mere negligence, grave danger to others must have been apparent, and the defendant must have chosen to run the risk rather than alter his conduct so as to avoid the act or omission which caused the harm.” Id. at 398.
15. “The words ‘wanton’ and ‘reckless’ constitute conduct that is ‘different in kind’ than negligence or gross negligence. It has been defined as ‘intentional conduct... involving] a high degree of likelihood that substantial harm will result to another.’ To constitute wanton or reckless conduct, ‘the risk of death or grave bodily injuiy must be known or reasonably apparent, and the harm must be a probable consequence of the defendant’s election to run that risk or of his failure reasonably to recognize it.’ Under Massachusetts law, *332 recklessness has an objective component as well as a subjective component. A defendant can be convicted of manslaughter even if he was ‘so stupid [or] so heedless . . . that in fact he did not realize the grave danger... if an ordinaiy normal man under the same circumstances would have realized the gravity of the danger.” Commonwealth v. Levesque, 436 Mass. 443, 452 (2000). Although it is true that recklessness must involve an intentional act or omission, a finding of recklessness is grounded in intent to engage in the reckless conduct, and not intent to bring about the harmful result. Commonwealth v. Bouvier, 316 Mass. 489, 494 (1944) (“It is settled in cases of homicide that one who wantonly or recklessly does an act that results in the death of a human being is guilty of manslaughter although he did not contemplate such a result”).
16. A “viable fetus” is a fetus “so far formed and developed that if then born it would be capable of living.” Commonwealth v. Crawford, 430 Mass. 683, 689 (2000), quoting Torigian v. Watertown News Co., 352 Mass. 446, 448 (1967). It is not necessaiy that the Commonwealth prove that the defendant is aware that a fetus is viable to be guilty of homicide. See Commonwealth v. Crawford, 430 Mass. 683, 691 (2000). One who engages in wanton or reckless conduct and who thereby causes the death of a viable fetus is guilty of involuntary manslaughter. See id. at 689. See also Commonwealth v. Cass, 392 Mass. 799, 801 (1984) (“We look to the common law as to whether a viable fetus can be the victim of a homicide and conclude that it can”).[10]
17. When the defendant discovered she was having a baby on the afternoon of January 2, 2007 and later felt a protruding foot, she was aware that there was a substantial risk of harm to the child unless she sought professional assistance. There is no evidence that she believed that the baby was already dead. There is no evidence that her life was in danger. There is no evidence that she was too weak or disabled to call for help. There is no credible evidence that she acted in an effort to save the life of the child or that the delivery was nearly instantaneous. While it is true that the defendant could not possibly know how long it would take for emergency personnel to arrive if called, her decision to pull and grab the baby in an effort to dislodge its head and deliver the baby by using a significant amount of force to bring about the delivery constituted a wanton and reckless act.[11]
18. The court is mindful that the Massachusetts Constitution protects a person from unwarranted government interference into “protected spheres of life.” See Goodridge v. Dept. of Public Health, 440 Mass. 309, 329 (2005). See also Moe v. Secretary of Administration and Finance, 382 Mass. 629, 648-49 (1981), and cases cited. In addition to the protections of Massachusetts law, in Roe v. Wade, 410 U.S. 113 (1973), the United States Supreme Court “recognized the right of a woman to make certain [fundamental decisions] affecting her destiny and confirmed once more that the protection of liberty under the Due Process Clause has a substantive dimension of fundamental significance in defining the rights of the person.” Lawrence v. Texas, 539 U.S. 558, 565 (2003).[12] However, there is no claim in this case that principles of substantive due process under either state or federal law forbid the Commonwealth from prosecuting a woman for inflicting fatal injuries on a viable and near-full-term fetus during the birthing process.[13] Moreover, the defendant’s conduct in this case transgresses the public policy of the Commonwealth. See G.L.c. 112, §12M (an abortion involving a pregnancy that has existed for twenty-four weeks or more can only be performed by a physician “and only if it is necessaiy to save the life of the mother, or if a continuation of her pregnancy will impose on her a substantial risk of grave impairment of her physical or mental health”); 130 C.M.R. §484.005 (providing that abortions may only be performed by licensed and qualified physicians in either a clinic or hospital setting; and providing further that “[a] third trimester abortion must be performed only to save the life of the mother or to eliminate substantial risk of grave impairment to her physical or mental health”).[14]
19.This Court also is mindful that the Supreme Judicial Court has ruled that the special relationship that exists between a mother and a fetus in útero calls for different standards when assessing the potential civil liability of the mother for negligent behavior. See Remy v. MacDonald, 440 Mass. 675, 683 (2004) (“We conclude that there are inherent and important differences between a fetus, in útero, and a child already born, that permits a bright line to be drawn around the zone of potential tort liability of one who is still biologically joined to an injured plaintiff’). The Remy decision is based in part on other public policy concerns that in a myriad of situations courts are not equipped to formulate the duty that may be owed by a pregnant woman to her fetus. For example, imagine tort actions brought by children based on a claim that while their mothers were pregnant they did not obtain adequate prenatal care, did not refrain from the consumption of foods or the use of substances that could be harmful to a fetus, did not exercise enough and get sufficient sleep, or did not arrange for a medical person or other helper to be present during childbirth. The Remy case does not mean, however, that pregnant women are exempt from all potential criminal liability for their conduct with respect to their unborn children. Recognition that a legal duty exists on the part of a pregnant woman to refrain from wanton or reckless acts committed against her own viable fetus does not impermissibly intrude into “protected spheres of life.” Goodridge, supra, 440 Mass. at 329, involves the application of an ascertainable standard, and is consistent with the public policy of the Commonwealth. See Commonwealth v. Pellegrini, 414 Mass. 402, 406 *333 n.7 (1993) (Supreme Judicial Court reversed a trial judge for violating Article 30 of the Declaration of Rights (separation of powers) by dismissing a charge of unlawful possession of cocaine brought against a pregnant woman that was based on evidence gathered from tests of her infant’s urine. The test results indicated the presence of metabolites of cocaine suggesting mother had consumed it during her pregnancy. The Court specifically left open the question whether a newborn’s urinalysis revealing cocaine metabolites is enough evidence to support a conviction of the mother for possession of a controlled substance.).[15]
Unlawfully Conveying Away a Body
20. The defendant is charged in count two with unlawfully conveying away a body. G.L.c. 272, §71 provides, in part, that “(w]hoever, not being lawfully authorized by the proper authorities, wilfully .. . conveys away a human body, or the remains thereof or knowingly aids in such . . . conveying away . . . shall be punished by imprisonment in the state prison for not more than three years or in jail for not more than two and one-half years or by a fine of not more than four thousand dollars.”
21. The court finds (and it was not contested at trial) that following the delivery of her baby on January 2, 2007, the defendant placed the body in a plastic bag, brought it outside the home, and placed it inside a trash receptacle. This conduct constitutes a violation of G.L.c. 272, §71.
ORDER
In a criminal case tried without a jury, the court’s responsibility is to apply the law to the facts it finds in order to reach a true and just verdict based solely on the law and the evidence. [16] Based on the above findings of fact and rulings of law, the court finds that the Commonwealth has proved beyond a reasonable doubt that the defendant, Alissa Pugh, is guilty of Manslaughter (involuntary) and of unlawfully conveying away a human body. The case will stand for sentencing in accordance with Mass.R.Crim.P. 28(b).

The Indictment charging the defendant with Manslaughter charges the offense in the standard statutory short form. There was no request for a bill of particulars and no particulars were filed by the Commonwealth. Contrast Commonwealth v. Edelin, 371 Mass. 497, 507 & n. 16 (1976). However, from the outset, the Commonwealth has proceeded on the theory that the defendant was guilty of involuntary manslaughter. In its closing argument, the Commonwealth further specified its theories of liability and the Court considers these theories as a limitation of the scope of the Indictment. See infra Section III, Rulings of Law.

During the trial and arguments, the Commonwealth has offered various theories about the defendant’s motive to commit these crimes. Evidence of motive is not essential to the Commonwealth’s case, but is relevant and admissible to help explain the conclusions that may be reached from the evidence. See Commonwealth v. Brown, 376 Mass. 156, 164 (1978). At various times, the Commonwealth suggested that financial stress, problems in her relationship with her boyfriend, or concern that the pregnancy might be the result of a sexual relationship with another man in the spring of 2006 may have motivated the defendant to conceal her pregnancy from everyone as long as possible. There is also an indication in her several statements to the police that the defendant had an aversion to contact with physicians and hospitals. After the birth of her son in 1998, the defendant allowed her health insurance to lapse and when reminded that she was without insurance when her son entered kindergarten, she failed to take steps to apply for any coverage that might be available to a low-income worker with a child. With the exception of one brief hospitalization after her son’s birth in 1998, the defendant did not see any doctors for wellness checks or any problems experienced by her or her son. It is not necessary for the court to come to any conclusion about the defendant’s motive other than to observe that the evidence in this case is consistent with a conscious effort on the defendant’s part to conceal the fact of her pregnancy from everyone.

In addition to the statements made by the defendant when the police first met her on January 6, 2007, the defendant was interviewed at the Milford Police Department on January 7,8, and 12,2007. See exhibit 9. The court viewed and listened to these interviews. The defendant at times became very upset and cried when answering questions about the delivery and birth of her child on January 2, 2007. She answered all the questions posed by the police. She was treated by the police with dignity and respect. Her accounts of the events of January 2, 2007 involving the birth of the child in question involved inconsistencies and in some cases were not consistent with other facts found by the court. These inconsistencies and variations were taken into account by the court in determining the facts.

I take judicial notice of the fact that while inside the mother’s uterus, a fetus resides in a double-walled sack of amniotic fluid commonly referred to as the “bag of waters.” I also take judicial notice of the fact that prior to the birth of a baby this bag or sack ruptures (or sometimes is ruptured by someone assisting the mother with the birth) which releases the amniotic fluid through the mother’s vagina, and that this event is commonly referred to as the breaking of the mother’s water.

Based on a consideration of all the evidence in this case, I do not credit the statements by the defendant that she did not learn that she was pregnant until October 2006 and that she believed she was only about three months pregnant as of January 2, 2007. I also do not credit the defendant’s statements that she had period in August 2006. However, the evidence does not permit a finding of precisely when the defendant did learn she was pregnant. Insofar as the defendant may have said during her interview with the police on January 12, 2007, that she removed the baby from her body to save its life, I find this is not consistent with the evidence taken as a whole and do not credit this statement. I find that she did not tell her boyfriend Jason Schiappucci of her pregnancy prior to January 2, 2007.1 find that the defendant was aware that she was beginning labor and experiencing contractions while at work on January 2, 2007.

This evidence was admitted over the defendant’s objection as bearing on a motive for the defendant’s conduct on January 2, 2007. See Mass.G.Evid. §404(b) (2008-2009).

I find that on December 30, 2006, while at the Marchiegiano Club in Milford, the defendant told acquaintances that she and Jay (her boyfriend) were not having any more children and then called in a louder voice to her boyfriend who was some distance away inside the bar, “Jay, we’re not having any more kids right?” Jay replied “No.”

There was opinion testimony by Dr. Roberts that the baby boy would have lived if the mother had called for help during the birthing process while mother was in the bathroom. I conclude that this opinion testimony should not have been admitted and I strike it from the record. Dr. Roberts did not have sufficient information about the length of time it would *334 have taken emergency personnel to reach the defendant if they had been called. See Mass.G.Evid. §702(a), and accompanying Note (2008-09). This view finds additional support in the testimony of Detective Richard Belanger of the Milford Police Department. He explained the way in which the 911 emergency telephone system worked in January 2007 when the caller is using a cell phone. The emergency call initially is routed to a Massachusetts State Police Dispatcher who in turn routes it to a public safely access point in the town or city where the emergency is believed to be occurring. In Milford, such a call would be directed by state police to the Milford Police who then would route the call to the Fire Department. The Fire Department, according to Detective Belanger would then dispatch a Rescue Truck staffed by Emergency Medical Technicians and call the local hospital and a private ambulance company. Although the police and fire departments in Milford are within 2-4 miles of 263 Purchase Street, Detective Belanger could not say that if an emergency cell phone call had been made by the defendant on January 2, 2007, it would have resulted in the arrival of trained emergency medical personnel within any specific amount of time.

G.L.c. 265, § 13 provides, in part, that “[wjhoever commits manslaughter shall, except as hereinafter provided, be punished by imprisonment in the state prison for not more than tweniy years or by a fine of not more than one thousand dollars and imprisonment in jail or a house of correction for not more than two and one half years . . .”

“[I]t would be a mere fiction to hold that a child is not a human being because the process of birth has not been fully completed, when it has reached that state of viability when the destruction of the life of its mother would not end its existence and when, if separated from the mother naturally or by artificial means, it will live and grow in the normal manner.” People v. Chavez, 77 Cal.App.2d 621, 626, 176 P.2d 92, 95 (Cal.App. 1947).

Contrast, United States v. Riley, 58 M.J. 305 (Court of Appeals Armed Forces 2003) (reversing the involuntary manslaughter conviction of a 19-year-old member of the Air Force who entered a bathroom on base and delivered a baby while seated on the toilet seat; evidence indicated that the baby “squirted out” and hit a hard ceramic floor suffering a fatal skull fracture; court reasons that defendant’s conduct was negligent, but did not constitute “a culpable disregard for the forseeable consequences to others”); Singleton v. State, 33 AlaApp. 536, 35 So.2d 375 (1948) (while mother may have been guilty of nonfeasance in failing to tie the umbilical cord of a baby that died shortly after an unattended birth, there was insufficient evidence of criminality to sustain a homicide conviction); Williams v. State, 88 Ga.App. 761, 77 S.E.2d 770 (1953) (where a mother left her baby near a heater for a short period of time following an unattended birth and thereafter attempted to conceal the body because she did not want her family to know about the birth, the court reversed a conviction of involuntary manslaughter); People v. Weeks, 115 Ill.App.3d 524, 450 N.E. 1351 (1983) (reversing a conviction under Illinois law for involuntary manslaughter because the state failed to prove that the defendant was physically capable of providing her newborn baby with essential care); State v. Doyle, 205 Neb. 234, 287 N.W.2d 59 (1980) (where a young girl gave birth to a baby unattended, dropped the baby while attempting to place him on the bed, and wrapped the baby in a blanket, believing the baby was dead, the court reversed a conviction of involuntary manslaughter, holding that although medical evidence showed that the baby died of smothering or neonatal respiratory failure, there was insufficient evidence that the defendant “acted in such a manner as to import a thoughtless disregard of the consequences of her act or heedless indifference to the rights and safety of the baby”); State v. Everhart, 291 N.C. 700, 231 S.E.2d 604 (1977) (Reversing a conviction for involuntary manslaughter that was based on evidence that the defendant, a young girl, with an I.Q. of 72, gave birth to the baby while lying on the floor and accidently dropped the newborn infant while attempting to place him upon the bed.); State v. Osmus, 73 Wyo. 183 276 P.2d 469 (1954) (nonfeasance during unattended birth, by a twenty-one-year-old defendant who had some training as a nurse, insufficient to prove manslaughter).

The essential framework of federal constitutional law with respect to a woman’s right to terminate a pregnancy and the extent to which the state may impose restrictions or conditions on that right was enunciated in Planned Parenthood of Southeastern Pa v. Casey, 505 U.S. 883, 878, 879 (1992) (Opinion of the court): “It must be stated at the outset and with clarity that Roe's essential holding, the holding we reaffirm, has three parts. First is a recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State. Before viability, the State’s interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman’s effective right to elect the procedure. Second is a confirmation of the State’s power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman’s life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child. These principles do not contradict one another; and we adhere to each.” Casey, 505 U.S. at 846. Compare Gonzales v. Carhart, 550 U.S. 124 (2007) (upholding federal Partial-Birth Abortion Ban Act of 2003); Stenberg v. Carhart, 530 U.S. 914 (invalidating Nebraska’s partial-birth abortion statute).

In at least one jurisdiction, there is an express prohibition against the criminal prosecution of a pregnant woman for criminal acts against her own child. See 18 Pa.C.S. §2608(a)(3) (exempting the pregnant woman in regard to crimes against her own unborn child). However, the Pennsylvania Supreme Court has explained that the purpose of the law was not to establish a right on anyone’s part to harm a fetus, but rather “the statute is plainly aimed at protecting fetal growth and development from unlawful interference.” Commonwealth v. Bullock, 590 Pa. 480, 494 (2006).

As noted above, there is no claim in this case nor any credible evidence that suggests that the defendant was acting to save her own life or the life of her baby, or was not capable for calling for help. There is no evidence that the defendant was suffering from a mental disease or defect. There is no evidence that the defendant suffers from any impairment in her intellectual functioning. In fact, from a consideration of her interviews with the police, the defendant appears to be a person of above average intelligence. There is evidence that the defendant had a troubled childhood and has difficulty in forming close bonds with others. This court has evaluated the medical evidence and varying accounts of the delivery of the child given by the defendant. This is not a case in which the defendant’s conduct was accidental or undertaken out of any necessity to save her own life or that of her child.

In Pellegrini, 414 Mass. at 403 n.2, the Court noted that the defendant was originally charged with possession with intent to distribute cocaine. The distribution portion of the indictment was dismissed by the trial judge and this ruling was not appealed by the Commonwealth.

The result reached in this case has no bearing on a pregnant woman’s decision to seek or decline prenatal care, to select the place where she chooses to give birth, or to give birth with or without attendants.